JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Burlington Stores, Inc.

**DEFENDANTS**

Zurich American Insurance Company

**(b)** County of Residence of First Listed Plaintiff    Delaware and New Jersey
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    New York and Illinois
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
John G. Koch/Flaster/Greenberg PC
1810 Chapel Ave. West
Cherry Hill, NJ 08002, (856)661-1900

Attorneys *(If Known)*
Susan M. Kennedy/Wiggin & Dana LLP
Two Liberty Place, Suite 2925, 50 S. 16th Street
Philadelphia, PA 19102,      (215) 988-8310

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | **INTELLECTUAL** | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §1332(a)(1)
Brief description of cause:
Declaratory judgment action involving property insurance policy

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE  6/25/2021

SIGNATURE OF ATTORNEY OF RECORD
*Susan M. Kennedy* - Counsel for Zurich-Removing Defendant

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## (CAMDEN)

| | |
|---|---|
| BURLINGTON STORES, INC., | |
| Plaintiff, | Case No.: |
| v. | |
| ZURICH AMERICAN INSURANCE COMPANY, | |
| Defendant. | |

TO:   THE JUDGES OF THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF NEW JERSEY (CAMDEN)

Pursuant to 28 U.S.C. §§ 1441 and 1446, Defendant Zurich American Insurance

Company ("ZAIC") hereby removes this action from the Superior Court of Burlington County,

in the State of New Jersey, to the United States District Court for the District of New Jersey.  In

support of removal, ZAIC asserts the following grounds:

1. This civil action is subject to removal as it is within the Court's original

   jurisdiction pursuant to 28 U.S.C. § 1332 (a)(1) because the matter in controversy

   exceeds the sum of $75,000, exclusive of interests and costs, and is between

   citizens of different states.

2. On or about May 18, 2021, Plaintiff Burlington Stores, Inc. ("Plaintiff") filed this

   action in the Superior Court of New Jersey, Burlington County, captioned as

   *Burlington Stores, Inc. v. Zurich American Insurance Company*, Docket No.

   BUR-L-001053-21.  A true and accurate copy of the Complaint is attached hereto

   as Exhibit A.

3. According to the Affidavit of Service filed by the Plaintiff, the Complaint in this matter was served on the Defendant via Debra Mullen, an administrative assistant with authority to accept service on behalf of ZAIC on or about May 26, 2021 and subsequently forwarded to ZAIC. *See* Exhibit B.

4. Complete diversity exists because, as set forth in the Complaint, Plaintiff is a citizen of Delaware and New Jersey – Burlington Stores, Inc. is a Delaware corporation, headquartered in New Jersey, while the Defendant is a citizen of New York and Illinois – ZAIC is a New York corporation, headquartered in Illinois.

5. Because Plaintiff is a citizen of different states than Defendant, complete diversity exists.

6. Further because Plaintiff seeks, *inter alia*, a declaration that Defendant is obligated to pay all of Plaintiff's accrued losses, and further estimate, in paragraph 12 of the Complaint that these losses could be in excess of $750,000,000, there is no question that the amount in controversy exceeds $75,000. Further, in accordance with Local Rule 201.1(d)(1), attorney Susan M. Kennedy, hereby certifies that to the best of her knowledge, information and belief, the Plaintiff is seeking damages in excess of $150,000, exclusive of interest and costs and any claim for punitive damages.

7. This notice is timely under 28 U.S.C. § 1446(b) because it is filed within 30 days after ZAIC received notice of the Complaint. *See* Exhibit B.

8.   Under 28 U.S.C. § 1441(a), the United States District Court for the District of

New Jersey is a proper venue for removal because it embraces the place where

this action is pending, the Superior Court of New Jersey, Burlington County.

9.   Contemporaneously with the filing of this notice of removal, Defendants have

provided Plaintiffs' counsel with written notice of this filing and will file a true

and accurate copy of this Notice, together with all exhibits, with the Clerk of the

Superior Court of Burlington County, in the State of New Jersey, as required by

28 U.S.C. § 1446(d).

10.  A copy of the docket report and all documents filed in the state court are attached

hereto as Exhibit C.

11.  By filing this petition for removal, ZAIC does not waive any of its potential

defenses or counterclaims to Plaintiffs' Complaint.

WHEREFORE, without waiving any of its potential defenses or counterclaims, ZAIC

requests that this action be removed from the Superior Court of Burlington County, in the State

of New Jersey, Docket No. BUR-L-001053-21, to this Court, and that there be no further

proceedings in the state court unless and until this case is remanded.

Dated: June 25, 2021

**WIGGIN & DANA, LLP**

Susan M. Kennedy
Wiggin and Dana LLP
Two Liberty Place, Suite 2925
50 S. 16th Street
Philadelphia, PA 19102
skennedy@wiggin.com

*Attorneys for Defendant*
*Zurich American Insurance Company*

# Exhibit A

**FLASTER/GREENBERG PC**
By:     Lee M. Epstein (*pro hac vice application forthcoming*)
        John G. Koch (Attorney No.: 042572005)
        Matthew A. Goldstein (Attorney No.: 029212010)
1810 Chapel Avenue West
Cherry Hill, New Jersey 08002
Tel: (856) 661-1900
Fax: (856) 661-1919
Email: lee.epstein@flastergreenberg.com
        john.koch@flastergreenberg.com
        matthew.goldstein@flastergreenberg.com
*Attorneys for Plaintiff Burlington Stores, Inc.*

| | |
|---|---|
| BURLINGTON STORES, INC., <br><br> Plaintiff, <br><br> v. <br><br> ZURICH AMERICAN INSURANCE COMPANY, <br><br> Defendant. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION BURLINGTON COUNTY <br><br> DOCKET NO.: <br><br> **COMPLAINT** |

Plaintiff Burlington Stores, Inc. ("Burlington"), by its undersigned counsel, Flaster/Greenberg PC, hereby submits its Complaint against Defendant Zurich American Insurance Company ("Zurich"), and in support thereof, avers as follows:

## I.     INTRODUCTION

1.      This action for declaratory judgment, and for related supplemental and further relief, arises out of an insurance coverage dispute between Burlington and Zurich.

2.      Burlington is a nationally recognized off-price retailer with over 780 stores in 45 states and Puerto Rico. Burlington's stores offer an extensive selection of in-season, fashion-focused merchandise, including women's ready-to-wear apparel, menswear, youth apparel, baby, beauty, footwear, accessories, home, toys, and coats.

3.      Further to its prudent business practices, and in recognition of its responsibilities to its associates (*i.e.*, employees), stockholders and customers, Burlington maintains various forms of insurance coverage.

4.      Specifically, Burlington purchased "All Risks" commercial property insurance policies from Zurich (the "Zurich All Risks Policies," as defined below) insuring against commonly occurring risks such as fire, as well as unanticipated and novel risks such as the SARS-CoV2 virus ("Coronavirus") and the disease it causes, Coronavirus Disease 2019 ("COVID-19").

5.      On March 11, 2020, the World Health Organization ("WHO") declared the COVID-19 outbreak a global pandemic.

6.      To date, there have been over 163 million confirmed cases of COVID-19 (over 32.7 million of them in the United States alone) and over 3.3 million deaths worldwide.[1]

7.      Burlington was not immune from the Coronavirus pandemic with many of its associates reporting cases of COVID-19.

8.      To combat the rapid spread of COVID-19 and to protect its customers, associates, and property, Burlington began closing certain stores and, effective March 22, 2020, Burlington closed all of its stores, distribution centers (other than processing of received inventory), and corporate offices.

9.      At the same time, state and local governments across the United States and governments around the world recognized the unprecedented and mushrooming outbreaks of COVID-19 and the Coronavirus' catastrophic impact through the direct physical loss of or damage

---

[1] *Coronavirus Disease 2019: COVID-19 Data Tracker,* CDC (updated May 17, 2021), https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited May 18, 2021); *WHO Coronavirus Disease (COVID-19) Dashboard*, WHO (updated May 18, 2021), https://covid19.who.int/ (last visited May 18, 2021).

to property and lives. As a consequence, many states issued "State of Emergency" Declarations, beginning in March 2020.

10.    Virtually every U.S. state where there was a Burlington store issued orders suspending or severely limiting business operations deemed to be "non-essential businesses" where people could potentially contract COVID-19 from others or from the property itself.

11.    The suspension of Burlington's business activities, consistent with the governmental mandates, precluded access to Burlington's stores, all of which are insured "Locations" under the Zurich All Risks Policies.

12.    As a result, Burlington sustained considerable business interruption and other losses and costs (currently calculated to be in excess of $750 million), for which it made a claim for insurance under the Zurich All Risks Policies.

13.    Zurich failed to honor its promise to insure Burlington under the Zurich All Risks Policies for the losses and costs that Burlington has sustained.

14.    Burlington therefore seeks a judicial declaration for the purpose of resolving this insurance coverage dispute that is centered in this county, where Burlington maintains its headquarters, where the Zurich All Risks Policies were procured by and delivered to Burlington, and where Burlington managed its claim for insurance through its Legal and Risk Management Departments.

## II.    PARTIES

15.    Burlington is a Delaware corporation with its principal place of business in Burlington, New Jersey.

16.    Based on information and belief, Zurich is a New York corporation with its principal place of business in Schaumburg, Illinois.

### III.   JURISDICTION AND VENUE

17.     This Court has jurisdiction pursuant to the New Jersey Declaratory Judgment Act, N.J.S.A. 2A:16-50 *et seq.*, to issue declaratory relief regarding the parties' respective rights and obligations under the Zurich All Risks Policies sold by Zurich to Burlington.

18.     This Court has personal jurisdiction over Zurich as it is licensed to issue insurance policies in the State of New Jersey, regularly does business within the State of New Jersey, and issued the Zurich All Risks Policies to Burlington in New Jersey.

19.     Venue in this Court is proper pursuant to New Jersey Court Rules 4:3-2(a) and 4:3-2(b) because Zurich does business by issuing insurance policies throughout the State of New Jersey, including in Burlington County, and may be served in Burlington County by service upon the Commissioner of Banking and Insurance. Venue is also proper pursuant to Rule 4:3-2(a)(3)-(b) because Burlington is a corporation that has a registered office, is doing business, and resides in Burlington County, New Jersey.

### IV.   FACTUAL BACKGROUND

**A.    The Zurich All Risks Policies**

*"All Risks" Insurance is "Special" and "Very Broad"*

20.     In exchange for the payment of substantial premiums, Zurich sold Burlington two "All Risks" First Party Property and Time Element insurance policies: Policy Number XPP0239022-01, effective from April 1, 2019 to April 1, 2020 and Policy Number XPP0239022-02, effective from April 1, 2020 to April 1, 2021 (collectively, the "Zurich All Risks Policies").

21.     The terms and conditions of the Zurich All Risks Policies are fully incorporated herein by reference.

22.     "All Risks" insurance is a special type of insurance extending to risks not usually contemplated and covering all fortuitous losses unless expressly excluded.

23.     The Zurich All Risks Policies incorporate the Zurich Edge Policy Form.

24.     Zurich marketed the Zurich Edge Policy Form as offering uniquely "broader coverage and greater flexibility[.]"[2]

25.     Zurich made the same promotional claims to insurance regulators. In an Explanatory Memorandum filed with the California Department of Insurance and the Oregon Insurance Division on January 11, 2008 and February 5, 2008, respectively, Zurich claimed that the Zurich Edge Policy Form offers "our Insured's [sic] a very broad and flexible policy."

### *The Zurich All Risks Policies Insure Burlington Against Loss or Damage Caused by a "Covered Cause of Loss"*

26.     The Insuring Agreement of the Zurich All Risks Policies provides: "This Policy Insures against direct physical loss of or damage caused by a **Covered Cause of Loss**[3] to Covered Property. . . ."

27.     "**Covered Cause of Loss**" is defined in the Zurich All Risks Policies as: "All risks of direct physical loss of or damage from any cause unless excluded."

28.     The term "direct" is not defined in the Zurich All Risks Policies and may be defined reasonably as: "proceeding from one point to another in time or space without deviation or interruption: STRAIGHT."[4]

---

[2] *Zurich introduces The Zurich Edge^{TM} for highly protected risks and global property markets*, Media    Release    Zurich    (Apr.    22,    2008), https://zsl.zurichna.com/zus/zna_config.nsf/pages/9123da88864cd81485257433006ed710!Open Document&Click=#:~:text=global%20property%20markets- (last visited May 18, 2021).

[3] Unless otherwise noted, capitalized and bolded terms herein are capitalized and bolded in the Policies.

[4] *Direct*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/direct (last visited May 18, 2021).

29.     The term "physical" is not defined in the Zurich All Risks Policies and may be defined reasonably as: "[r]elating to things perceived through the senses as opposed to the mind; tangible or concrete."[5]

30.     The term "loss" is not defined in the Zurich All Risks Policies and may be defined reasonably as: "the act of losing possession: DEPRIVATION."[6]

31.     The term "damage" is not defined in the Zurich All Risks Policies and may be defined reasonably as: "[p]hysical harm caused to something in such a way as to impair its value, usefulness, or normal function."[7]

32.     Burlington's losses resulted from "loss of or damage" to either Covered Property, or to Property of the type insurable under the Zurich All Risks Policies, when the Coronavirus and COVID-19 caused a loss of or a deprivation of insured property and otherwise impaired the functionality of such property.

33.     The "loss of or damage" to Covered Property, or to other Property of the type insurable under the Zurich All Risks Policies, resulting from the Coronavirus and COVID-19 was "direct" in that it was without deviation or interruption.

34.     The "loss of or damage" to Covered Property, or to other Property of the type insurable under the Zurich All Risks Policies, resulting from the Coronavirus and COVID-19 was "physical" in that it was tangible, concrete and capable of being perceived through the senses as opposed to the mind.

---

[5] *Physical*, OXFORD ENGLISH DICTIONARY, https://www.lexico.com/en/definition/physical (last visited May 18, 2021).

[6] *Loss*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/loss (last visited May 18, 2021).

[7] *Damage*, OXFORD ENGLISH DICTIONARY, https://www.lexico.com/en/definition/damage (last visited May 18, 2021).

35.     The Zurich All Risks Policies insure Burlington against Property Damage and Time

Element[8] Loss, and provide other Special Coverages.

36.     With regard to Property Damage, the Zurich All Risks Policies insure Burlington's

Covered Property, including Burlington's interest in real and personal property.

37.     With regard to Time Element Loss, the Zurich All Risks Policies cover loss

resulting from "the necessary **Suspension** of the Insured's business activities at an Insured

Location."

38.     The terms **Suspension (Suspended)** are defined in the Zurich All Risks Policies,

in pertinent part, as: "The slowdown or cessation of the Insured's business activities."

39.     The Time Element coverages of the Zurich All Risks Policies include, in pertinent

part:

- **Gross Earnings:** as determined by the "Gross Earnings value that would have been earned during the Period of Liability, less charges and expenses that do not necessarily continue during the Period of Liability."

- **Extra Expense:** defined to mean "that amount spent to continue the Insured's business activities over and above the expenses the Insured would have normally incurred had there been no direct physical loss of or damage caused by a **Covered Cause of Loss** to Property of the type insurable under this policy at a **Location**."

- **Leasehold Interest:** pursuant to which, Zurich promised to pay Burlington "the present value of the actual rent payable for the unexpired term of the lease" if the building (or structure) becomes wholly untenantable or unusable and "the present value of the proportionate amount of the actual rent payable for the unexpired term of the lease" if the building (or structure) becomes partially untenantable or unusable.

---

[8] "Time Element Insurance" is defined as "a property insurance term referring to coverage for loss resulting from the inability to put damaged property to its normal use. This type of coverage is called 'time element' insurance because the amount of loss depends on how long it takes to repair or replace the damaged property. The best-known types of time element insurance are business interruption and extra expense coverage." *Time Element Insurance*, INTERNAL RISK MANAGEMENT INSTITUTE, https://www.irmi.com/term/insurance-definitions/time-element-insurance (last visited May 18, 2021).

- **Extended Period of Liability**: pursuant to which Zurich agreed that upon termination of the coverage for Gross Earnings loss, the Zurich All Risks Policies "will continue to pay the actual Gross Earnings loss sustained by the Insured" for up to 365 days.

40.     The Zurich All Risks Policies also include numerous Special Coverages that apply

to Burlington's losses, including the following:

- CIVIL OR MILITARY AUTHORITY coverage for "the actual Time Element loss sustained by the Insured, as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** is caused by order of civil or military authority that prohibits access to the **Location**."

- CONTINGENT TIME ELEMENT coverage for "the actual Time Element loss as provided by the Policy, sustained by the Insured during the Period of Liability directly resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** results from direct physical loss of or damage caused by a **Covered Cause of Loss** to Property (of the type insurable under this Policy) at **Direct Dependent Time Element Locations**, **Indirect Dependent Time Element Locations**, and **Attraction Properties** located worldwide[.]"

- DECONTAMINATION COSTS coverage, which provides in relevant part: "If Covered Property is **Contaminated** from direct physical loss of or damage caused by a **Covered Cause of Loss** to Covered Property and there is in force at the time of the loss any law or ordinance regulating **Contamination** due to the actual not suspected presence of **Contaminant(s)**, then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such **Contaminated** Covered Property in a manner to satisfy such law or ordinance."

- INGRESS/EGRESS coverage for "the actual Time Element loss sustained by the Insured, as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if ingress or egress to that Insured Location by the Insured's suppliers, customers or employees is prevented by physical obstruction due to direct physical loss of or damage caused by a **Covered Cause of Loss** to property not owned, occupied, leased or rented by the Insured or insured under this Policy and located within the distance of the Insured Location as stated in the Declarations."

-8-

### *The Zurich All Risks Policies Obligated Burlington to Protect and Preserve its Property from Loss or Damage and Insured Burlington for the Associated Losses and Costs*

41.     The Zurich All Risks Policies provide PROTECTION AND PRESERVATION OF PROPERTY coverage, for "[t]he reasonable and necessary costs incurred for actions to temporarily protect or preserve Covered Property; provided such actions are necessary due to actual or imminent physical loss or damage due to a **Covered Cause of Loss** to such Covered Property" and "[t]he Gross Earnings loss sustained by the Insured for a period of time not to exceed the hours listed in the Declarations prior to and after the Insured first taking reasonable action for the temporary protection and preservation of Covered Property."

42.     Separately, under a policy condition entitled, "DUTIES IN THE EVENT OF LOSS OR DAMAGE," the Zurich All Risks Policies obligated Burlington to mitigate its loss to its property:

> Take all reasonable steps to protect the Covered Property from further damage caused by a **Covered Cause of Loss**. If feasible, set the damaged property aside and in the best possible order for examination. Also, keep a record of expenses for emergency and temporary repairs for consideration in the settlement of the claim.

43.     The suspension of Burlington's business activities, including the closure of Burlington's stores, distribution centers and other properties, and then reopening only with significant modifications, was necessary for the protection and preservation of Covered Property required under the Zurich All Risks Policies and the losses and costs resulting from that necessary suspension are insured.

### *No Exclusion Applies*

44.     The Zurich All Risks Policies also contain various exclusions, none of which apply in this case.

45. Specifically, the Zurich Edge Policy Form contains a so-called Contamination Exclusion that was deleted by endorsement to the Zurich All Risks Policies and is otherwise inapplicable.

46. The Contamination Exclusion set forth in the Zurich Edge Policy Form provides as follows: "**Contamination**, and any cost due to **Contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy, except as provided by the Radioactive Contamination Coverage of this Policy."

47. The Contamination Exclusion set forth in the Zurich Edge Policy Form was deleted from the Zurich All Risks Policies by endorsement (the "Virus Deletion Endorsement") and replaced with the following provision: "**Contamination** or asbestos, and any cost due to **Contamination** or asbestos including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy." *See* Policy Endorsement, form EDGE-219-C (01/18).

48. The Zurich Edge Policy Form defines **Contamination(Contaminated)** as: "Any condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, **Fungus**, mold or mildew."

49. The definition of **Contamination(Contaminated)** set forth in the Zurich Edge Policy Form was deleted from the Zurich All Risks Policies by the Virus Deletion Endorsement and replaced with the following: "Any condition of property due to the actual presence of any **Contaminant(s)**."

50. The definition of **Contaminant(s)** set forth in the Zurich Edge Policy Form in each of the Zurich All Risks Policies was also deleted from the Zurich All Risks Policies by the Virus Deletion Endorsement and replaced with the following: "Any solid, liquid, gaseous, thermal or

other irritant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), other hazardous substances, **Fungus** or **Spores**."

51.    The Zurich All Risks Policies, as amended by the Virus Deletion Endorsement, thereby delete the reference to, among other things, "virus" from the Contamination Exclusion.

52.    The Virus Deletion Endorsement applies to all risks insured under the Zurich All Risks Policies without regard to the location of those risks.

53.    The Virus Deletion Endorsement changes the Zurich All Risks Policies in their entirety, providing in bolded, all capitalized lettering: "**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**" (Emphasis in original.)

54.    Other endorsements to the Zurich All Risks Policies, however, are expressly and unambiguously limited only to risks located in a specified state.

55.    For example, the Zurich All Risks Policies contain a New York state-titled endorsement, entitled "Amendatory Endorsement – New York," which provides: "**THIS ENDORSEMENT CHANGES THE POLICY AND APPLIES TO THOSE RISKS IN NEW YORK.**" (Emphasis in original.)

56.    Similarly, the Zurich All Risks Policies contain a Connecticut state-titled endorsement, entitled "Amendatory Endorsement – Connecticut," which provides: "**THIS ENDORSEMENT CHANGES THE POLICY AND APPLIES TO THOSE RISKS IN CONNECTICUT.**" (Emphasis in original.)

57.    Upon information and belief, when Zurich sold the Zurich All Risks Policies to Burlington, Zurich knew that the Virus Deletion Endorsement applied policy wide and contained no geographical limitation.

58.     Upon information and belief, Zurich knew that losses resulting from viruses and pandemics were covered under the Zurich Edge Policy Form in the absence of a clear and express exclusion for viruses.

59.     Upon information and belief, in deleting the Contamination Exclusion and replacing it with the Virus Deletion Endorsement, Zurich knew that an exclusion addressed to "contamination" is not a proper method for barring coverage for losses resulting from viruses.

60.     Knowing that an exclusion addressed to "contamination" was an improper method for excluding losses resulting from viruses, Zurich removed the reference to virus from the scope of the Contamination Exclusion when it issued the Zurich All Risks Policies to Burlington.

61.     Specifically, in 2011, Zurich submitted a revised version of the Zurich Edge Policy Form to the Louisiana Insurance Department (the "Department") for approval. The Department objected to several provisions in Zurich's revised form, including the Contamination Exclusion, stating in an Explanatory Memorandum that by the inclusion of health hazards such as "pathogens . . . bacteria and virus" within the definition of "Contamination," the base form's version of the Contamination Exclusion went beyond the scope of what was appropriate for an exclusion for contamination." A true and correct copy of the referenced filing is attached hereto as **Exhibit A** and is incorporated by reference.

62.     The Explanatory Memorandum states:

> This Department views pollutants as substances that damage the natural environment when accidentally spilled, leaked, or discharged. **Hence, the presence of products such as ... mold, mildew, and bacteria and virus that lead to disease or health hazards do not fit our definition of pollutants and should not be included in the text of a pollution exclusion or referred to as examples of pollutants**.

Exhibit A at 13 (emphasis added).

63.    The Explanatory Memorandum states further that, if Zurich wished to exclude losses

resulting from health hazards, it should create separate exclusions for such losses, because it is not

appropriate to exclude them by way of a contamination/pollution exclusion:

> Damages relating to these types of products and health hazards
> **MAY** be excluded from coverage, but they should not be included
> within a pollution exclusion. It is recommended to create separate
> exclusions and definitions for contaminants such as fungus, mold,
> asbestos, spores, bacteria, virus, biological substances, medical
> waste and products that may lead to disease [if Zurich wanted to
> exclude those risks].

Exhibit A at 13 (capitalization in original; emphasis added).

64.    This approach is consistent with long standing precedent in New Jersey, holding

that pollution exclusions should only be used to exclude "traditional pollutants" like industrial

hazardous wastes. *See, e.g., Nav-Its Inc. v. Selective Ins. Co. of Am.*, 183 N.J. 110, 123-24 (2005);

*Byrd ex rel. Byrd v. Blumenreich*, 317 N.J. Super. 496, 503 (App. Div. 1999).

65.    Zurich did not create a separate exclusion for viruses and instead removed the

reference to virus from the Contamination Exclusion by endorsing the Zurich All Risks Policies

with the Virus Deletion Endorsement.

66.    Upon information and belief, when Zurich sold the Zurich All Risks Policies to

Burlington it knew that standard-form exclusions for pandemic risks were available in the

insurance marketplace.

67.    Upon information and belief, Zurich sold insurance policies to other insureds that

included such exclusions.

68.    Given the liability that insurers, including Zurich, faced for losses from pandemics,

shortly after the outbreak of SARS in 2003, the insurance industry undertook to draft broad

exclusions to bar coverage for losses from viruses and bacteria.

69. In 2006, the Insurance Services Office, Inc. ("ISO"),[9] the insurance industry's insurance policy drafting organization, promulgated a specific exclusion for losses caused by a virus.

70. On July 6, 2006, ISO prepared a circular that included a standard exclusion of loss due to viruses and bacteria as part of its filing with state insurance regulators.[10] In that circular, ISO noted that examples of "viral and bacterial contaminants are rotavirus, SARS, [and] influenza," observing, "[t]he universe of disease-causing organisms is always in evolution."[11]

71. ISO recognized that viruses could cause property damage, including business interruption losses, stating:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. **When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses**.[12]

---

[9] "ISO is a nonprofit trade association that provides rating, statistical, and actuarial policy forms and related drafting services to approximately 3,000 nationwide property or casualty insurers. Policy forms developed by ISO are approved by its constituent insurance carriers and then submitted to state agencies for review. Most carriers use the basic ISO forms, at least as the starting point for their general liability policies." *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 671 n.13 (1995) (citations omitted).

[10] ISO Circular, "*New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria*," (July 6, 2006), https://www.propertyinsurancecoveragelaw.com/files/2020/03/ISO-Circular-LI-CF-2006-175-Virus.pdf (last visited May 18, 2021).

[11] *Id.*

[12] *Id.* (emphasis added); *see also* https://www.propertyinsurancecoveragelaw.com/2021/05/articles/insurance/iso-internal-documents-are-important-regarding-covid-litigation/ (last visited May 18, 2021).

72.     Upon information and belief, Zurich and the rest of the insurance industry have long known that the presence of a virus on or around property can constitute direct physical loss of or damage to property.

73.     Zurich sold the Zurich All Risks Policies to Burlington without any exclusion applicable expressly to the loss or damage arising from pandemics generally, or from viruses specifically.

**B.     The Coronavirus Pandemic and the Resulting Loss of or Damage to Property and the Necessary Suspension of Burlington's Business Activities**

### *The Coronavirus and COVID-19*

74.     The Coronavirus causes serious systemic illness and death.

75.     COVID-19 is a severe infectious disease caused by the Coronavirus.

76.     According to the WHO, "[t]he disease spreads primarily from person to person through small droplets from the nose or mouth, which are expelled when a person with COVID-19 coughs, sneezes, or speaks . . . . People can catch COVID-19 if they breathe in these droplets from a person infected with the virus . . . . These droplets can land on objects and surfaces around the person such as tables, doorknobs and handrails. People can become infected-by touching these objects or surfaces, then touching their eyes, nose or mouth."[13]

77.     New Jersey experienced a reported COVID-19 outbreak beginning in March 2020 and became an epicenter of sickness, death, and property damage caused by the Coronavirus and COVID-19.[14]

---

[13] *Q&A on coronaviruses (COVID-19)*, WHO (Apr. 17, 2020), https://web.archive.org/web/20200506094904/https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses (last visited May 18, 2021).

[14] *COVID-19 Vaccination Plan: New Jersey*, N.J. DEPT. HEALTH (Dec. 15, 2020),

### *The Coronavirus Causes Direct Physical Loss of or Damage to Property*

78.     The presence of the Coronavirus in and on property, including indoor air, surfaces, and objects, causes direct physical loss of or damage to property by altering property and rendering it incapable of being used for its intended purpose, untenantable, and uninhabitable.

79.     With regard to indoor spaces, the Centers for Disease Control ("CDC") has recommended "ventilation interventions" to help reduce exposure to the airborne Coronavirus, including increasing airflow and air filtration (such as with high-efficiency particulate air (HEPA) fan/filtration systems).[15]

80.     "Fomites" are physical objects or materials that carry and are capable of transmitting infectious agents, altering these objects to become vectors of disease.[16]

81.     Fomite transmission has been demonstrated as highly efficient for viruses, both from object-to-hand and from hand-to-mouth.[17]

82.     In addition, while fomite transmission may not be the primary route of transmission for COVID-19, fomite transmission is important and has been estimated to be responsible for up to 25% of all deaths due to COVID-19 since lockdowns were imposed.[18]

---

https://nj.gov/health/legal/covid19/NJ%20Interim%20COVID-19%20Vaccination%20Plan%20-%20Revised%2012-15-20.pdf (last visited May 18, 2021).

[15] *Ventilation in Buildings*, CDC (updated Mar. 23, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/ventilation.html#:~:text=HEPA%20filters%20are%20even%20more,with%20SARS%2DCoV%2D2 (last visited May 18, 2021).

[16]     *See, e.g., Fomite*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/fomite (last visited May 18, 2021).

[17] Jing Cai et al., *Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020*, 26 EMERGING INFECTIOUS DISEASES 6 (June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article (last visited May 18, 2021).

[18] A. Meiksin, *Dynamics of COVID-19 transmission including indirect transmission mechanisms: a mathematical analysis*, 148 EPIDEMIOLOGY & INFECTION e257, 1-7 (Oct. 20, 2020), https://www.cambridge.org/core/journals/epidemiology-and-infection/article/dynamicsof-

83.   The WHO has described fomite transmission as follows:

> Respiratory secretions or droplets expelled by infected individuals
> can contaminate surfaces and objects, creating fomites
> (contaminated surfaces). **Viable SARS-CoV-2 virus and/or RNA
> detected by RT-PCR can be found on those surfaces for periods
> ranging from hours to days,** depending on the ambient
> environment (including temperature and humidity) and the type of
> surface, in particular at high concentration in health care facilities
> where COVID-19 patients were being treated. Therefore,
> transmission may also occur indirectly through touching surfaces in
> the immediate environment or objects contaminated with virus from
> an infected person[.][19] (Emphasis added.)

84.   Fomites transform the surface of property into a potentially deadly Coronavirus

transmission device.

85.   The WHO's description of fomite transmission of COVID-19 expressly recognizes

this physical alteration of property, describing viral droplets as "**creating** fomites (contaminated

surfaces)."[20] (Emphasis added.)

86.   "Creating" involves making or bringing into existence something new[21] – such as

something that is in an altered state from what it was before the Coronavirus was present on, in,

and around the property.

87.   The presence of Coronavirus in and on property, including indoor air, surfaces, and

objects, renders the property lost, unsafe and unfit for its normal usage and otherwise untenantable

and uninhabitable.

---

covid19-transmission-including-indirect-transmission-mechanisms-a-
mathematicalanalysis/A134C5182FD44BEC9E2BA6581EF805D3 (last visited May 18, 2021).

[19] *Transmission of SARS-CoV-2: implications for infection prevention precautions*,
WHO (July 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-
cov-2-implications-for-infection-prevention-precautions (last visited May 18, 2021).

[20] *Id.*

[21] *Create*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/create
(last visited May 18, 2021).

### *The Governmental Emergency Declarations and Orders Recognized the Imminent Threat and the Actual Loss of or Damage to Property Posed by the Coronavirus*

88.    In order to stop the spread of COVID-19, governmental bodies throughout the United States issued emergency declarations and orders.

89.    Those emergency declarations and orders recognized that the Coronavirus harms property as well as people and cannot be easily wiped off surfaces.

90.    For example, on March 16, 2020, Governor Jay Inslee issued an order closing fitness centers, theaters, and indoor dining (and certain other business) in Washington State.[22] That order cautioned that COVID-19 was a "public disaster affecting. . . property"; that state government agencies were working with local health officials "in alleviating the impacts to . . . property"; and that among its objectives was to "help preserve and maintain . . . property[.]"[23]

91.    On the same day, New Orleans Mayor Latoya Cantrell  issued an emergency order suspending large gatherings and closing certain categories of businesses, stating "there is reason to believe that COVID-19 may be spread amongst the population by various means of exposure, including the propensity to spread person to person and **the propensity to attach to surfaces for prolonged periods of time, thereby spreading from surface to person and causing property loss and damage** in certain circumstances[.]"[24] In addition, the emergency order provided that "imminent and emergency action must be taken to mitigate the effects of COVID-19 . . . and

---

[22] *Proclamation by the Governor Amending Proclamation 20-05*, OFF. GOVERNOR, No. 20-13 (Mar. 16, 2020), https://www.governor.wa.gov/sites/default/files/proclamations/20-13%20Coronavirus%20Restaurants-Bars%20%28tmp%29.pdf (last visited May 18, 2021).

[23] *Id.*

[24] *Mayoral Proclamation to Promulgate Emergency Orders During the State of Emergency Due to COVID-19*, CITY DIST. CT. FOR THE PARISH OF ORLEANS, No. 2020-02602 (Mar. 16, 2020), https://nola.gov/mayor/executive-orders/emergency-declarations/03162020-mayoral-proclamation-to-promulgate-emergency-orders-during-the-state-of-emergency-due-to-co/   (last visited May 18, 2021).

preserve the lives and property of the people of the City of New Orleans[.]"[25] (Emphasis added.)

92.      Also on March 16, 2020, New York City Mayor Bill de Blasio issued an emergency executive order closing non-essential businesses in the city and declaring, "this order is given because of the propensity of the virus to spread person to person and also **because the virus physically is causing property loss and damage[.]**"[26] (Emphasis added.)

93.      On March 19, 2020, Los Angeles Mayor Eric Garcetti issued a shutdown order, explaining "[t]his Order is given because, among other reasons, the COVID-19 virus can spread easily from person to person and **it is physically causing property loss or damage due to its tendency to attach to surfaces for prolonged periods of time**."[27] (Emphasis added.)

94.      On March 22, 2020, Broward County, Florida issued Emergency Order 20-01 stating that the Order is "necessary because of the propensity of the virus to spread person to person and also because the **virus is physically causing property damage due to its proclivity to attach to surfaces for prolonged periods of time**[.]"[28] (Emphasis added.)

95.      Also on March 22, 2020, Philadelphia Mayor Jim Kenney issued Emergency Order No. 2 stating, "COVID-19 may remain viable for hours to days on surfaces made from a variety

---

[25] *Id.*

[26] *Emergency Executive Order No. 100*, OFF. MAYOR, (Mar. 16, 2020), https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-100.pdf (last visited May 18, 2021).

[27] *Public Order Under City of Los Angeles Emergency Authority*, OFF. MAYOR (Mar. 19, 2020, revised May 27, 2020), https://www.lamayor.org/sites/g/files/wph1781/files/page/file/20200527%20Mayor%20Public%20Order%20SAFER%20AT%20HOME%20ORDER%202020.03.19%20%28REV%202020.05.27%29.pdf (last visited May 18, 2021).

[28] *Broward County Administrator's Emergency Order 20-01* (Mar. 22, 2020), https://www.broward.org/CoronaVirus/Documents/BerthaHenryExecutiveOrder20-01.pdf (last visited May 18, 2021).

of materials located in businesses and other places, thus **contaminating certain property and places**[.]"[29] (Emphasis added.)

96.     Louisiana Governor John Bel Edwards issued Stay at Home and Closure Orders that were in effect from March 23, 2020 to May 15, 2020, requiring all individuals within the state to stay at home unless performing essential activities and requiring non-essential businesses to close to the public. In Proclamation No. 33 JBE 2020, Governor Edwards specifically acknowledged that "these measures relating to closure of certain businesses and to limit the operations of non-essential businesses are necessary because of the **propensity of the COVID-19 virus to spread . . . due to its ability to attach to surfaces for prolonged periods of time**[.]"[30] (Emphasis added.)

97.     On March 26, 2020, Colorado Governor Jared Polis' Executive Order D 2020 017 and the Colorado Department of Public Health and Environment's ("CDPHE") Second Updated Public Health Order 20-24 became effective, requiring all residents to stay at home unless performing essential activities and requiring all non-critical businesses to close to the public. The CDPHE's updated Order 20-24 specifically acknowledged that "COVID-19 also **physically contributes to property loss . . . and damage** due to its propensity to attach to surfaces for prolonged periods of time" and "[t]his [Order] **helps to reduce the property damage caused by**

---

[29] *Emergency Order Temporarily Prohibiting Operation of Non-Essential Businesses and Congregation of Persons to Prevent the Spread of 2019 Novel Coronavirus (COVID-19)*, OFF. MAYOR, Order No. 2 (Mar. 22, 2020), https://www.phila.gov/media/20200322130746/Order-2-Business-And-Congregation-Prohibition-Stay-At-Home.pdf (last visited May 18, 2021).

[30] *Additional Measures for COVID-19 Stay at Home*, EXEC. DEPT., No. 33 JBE 2020 (Mar. 22, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/JBE-33-2020.pdf (last visited May 18, 2021).

**COVID-19** and preserves the welfare of our residents by reducing the spread of the disease in our communities and our workplaces[.]"[31] (Emphasis added.)

98.     On April 10, 2020, in a supplement to a mayoral proclamation, San Francisco Mayor London Breed extended coronavirus-related orders and stated, "[t]his order and the previous orders issued during this emergency have all been issued because of the propensity of the virus to spread person to person and also because **the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time**[.]"[32] (Emphasis added.)

99.     On April 23, 2020, Dallas County Judge Clay Jenkins issued an amended "Safer At Home Order" that states, "this Emergency Order is necessary because of the propensity of **the virus to spread person to person and also because the virus is physically causing property damage due to its proclivity to attach to surfaces for prolonged periods of time**[.]"[33] (Emphasis added.)

100.    On April 29, 2020, Nevada Governor Steve Sisolak issued Emergency Directive 016 recognizing the threat SARS-CoV-2 poses to property, stating "the ability of the novel coronavirus that causes COVID-19 to survive on surfaces for indeterminate periods of time

---

[31] *Updated Public Health Order 20-24 Implementing Stay at Home Requirements*, COLO. DEPT. OF PUB.    HEALTH    &    ENV'T,    (Mar.    26,    2020), https://covid19.colorado.gov/sites/covid19/files/Updated%20Public%20Health%20Order%20-%20Authorized%20Business.32620.pdf (last visited May 18, 2021).

[32] *Ninth Supplement to Mayoral Proclamation Declaring the Existence of a Local Emergency Dated    February    25,    2020*,    OFF.    MAYOR    (Apr.    10,    2020), https://sfmayor.org/sites/default/files/NinthMayoralSupplement.pdf (last visited May 18, 2021).

[33]     *Amended    Order    of    County    Judge    Clay    Jenkins*    (Apr.    23,    2020), https://www.dallascounty.org/Assets/uploads/docs/covid-19/orders-media/2020/april/042320-DallasCountyOrder.pdf (last visited May 18, 2021).

<u>renders some property unusable and contributes to . . . damage, and property loss</u>[.]"[34]

(Emphasis added.)

101. On June 26, 2020 Governor Phil Murphy issued Executive Order 157 permitting the limited reopening of retail establishments subject to restrictions such as a capacity limit of "50% of the stated maximum store capacity" and other workplace safeguards.[35] These limitations were expressly issued, among other reasons, to protect against fomite transmission of the Coronavirus, and explicitly addressed the Coronavirus' impacts upon property in numerous ways, including, but not limited to, requiring businesses to:

- conduct "frequent sanitization of high-touch areas";

- "[c]lean and disinfect equipment that is rented in accordance with CDC and [Department of Health] guidelines" – that is, more arduous, extensive and stringent cleaning and disinfecting standards than those in the ordinary course of those activities;

- "[c]lean and disinfect the worksite in accordance with CDC guidelines when a worker at the site has been diagnosed with COVID-19 illness"; and

- "[r]outinely clean and disinfect all high-touch areas" including "common surfaces, safety equipment, and other frequently touched surfaces[.]"[36]

### *The Coronavirus Cannot be Removed or Eliminated by Routine Cleaning*

102. An indoor space exposed to the Coronavirus cannot be made safe and fit for its intended use by routine surface cleaning.

---

[34] *Declaration of Emergency Directive 016*, OFF. GOVERNOR (Apr. 29, 2020), https://gov.nv.gov/News/Emergency_Orders/2020/2020-04-29_-_COVID-19_Declaration_of_Emergency_Directive_016_(Attachments)/ (last visited May 18, 2021).

[35] *Executive Order No. 157*, OFF. GOVERNOR (June 26, 2020), https://www.nj.gov/infobank/eo/056murphy/pdf/EO-157.pdf (last visited May 18, 2021).

[36] *Id.*

103.    The CDC recently released guidance stating that there is little evidence to suggest that routine use of disinfectants can prevent the transmission of the Coronavirus from fomites in community settings.[37]

104.    The CDC concluded that, according to a more quantitative microbial risk assessment study, "surface disinfection once- or twice-per-day had little impact on reducing estimated risks" of Coronavirus transmission.[38]

105.    A number of other studies indicate that the Coronavirus is "much more resilient to the cleaning than most other respiratory viruses so tested."[39]

106.    With respect to textiles – a significant component of the merchandise sold at Burlington's stores – studies have demonstrated that the virus can survive on fabrics and be transferred to skin and other surfaces, "suggesting it is biologically plausible that . . . infectious diseases can be transmitted directly through contact with contaminated textiles."[40]

107.    Aerosolized Coronavirus particles and virions cannot be eliminated by routine surface cleaning and in some cases cleaning contaminated surfaces (*i.e.*, floors) could reasonably result in re-aerosolization of the Coronavirus.

---

[37] *Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments*, CDC (updated Apr. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html (last visited May 18, 2021).

[38] *Id.* (citing A. K. Pitol & T. R. Julian, *Community transmission of SARS-CoV-2 by fomites: Risks and risk reduction strategies*, ENVTL. SCI. & TECH. LETTERS (2020)).

[39] Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates*, 92 J. MED. VIROLOGY 11, 2498-510 (June 10, 2020), https://onlinelibrary.wiley.com/doi/10.1002/jmv.26170 (last visited May 18, 2021).

[40] Lucy Owen & Katie Laird, *The role of textiles as fomites in the healthcare environment: a review of the infection control risk*, 8 PEER J. LIFE & ENV'T e9790 (Aug. 25, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7453921/#:~:text=Results,through%20contact%20with%20contaminated%20textiles (last visited May 18, 2021).

108.    Given the ubiquity, pervasiveness and increasing transmission of the Coronavirus, including new and emerging variants, no amount of cleaning or ventilation intervention will prevent a person infected and contagious with the Coronavirus from entering an indoor space and exhaling millions of additional Coronavirus droplets and infectious aerosols into the air, further: (a) filling the air with the aerosolized Coronavirus that can be inhaled, sometimes with deadly consequences; and (b) depositing infectious Coronavirus droplets on the surfaces, physically altering and transforming those surfaces into disease-transmitting fomites.

### *Burlington's Stores and Other Locations Reopened Under Severe Restrictions Designed to Protect Customers, Associates, and Property*

109.    Beginning on May 11, 2020, Burlington started re-opening its stores following the March 2020 closures.

110.    The reopening of Burlington's stores and distribution centers did not abate Burlington's losses arising from the loss of or damage to its property. To the contrary, in order to prevent further direct physical loss of or damage to its property and to stay open and continue operating its stores and distribution centers in a safe and compliant manner, Burlington has incurred significant costs and extra expenses and imposed restrictions on certain of its services. These costs/expenses/bans/restrictions include, but are not limited to:

- operating the Burlington stores at reduced hours of operation;

- providing Personal Protective Equipment (PPE) to its associates such as facemasks, face shields, and gloves;

- designing, engineering, and installing barriers (such as point of sale locations) to hamper direct and droplet transmission of the Coronavirus and COVID-19 and foster social distancing;

- closing and barricading of all fitting rooms;

- making hand sanitizer, disinfecting wipes, soap, and water readily available to customers and associates;

- purchasing and placing readily visible signage to encourage safe practices among associates and customers;

- regularly and frequently cleaning any high-touch and frequently touched surfaces according to heightened CDC and state department of health guidelines;

- dramatically increasing cleaning frequency at its stores;

- removing fixtures to widen aisles to allow for additional social distancing; and

- upgrading HVAC ventilation filters at certain stores.

## C.   Burlington Sustained Devastating Losses

111.   Burlington has suffered and continues to suffer catastrophic losses from the loss of and damage to its Covered Property and other Property of the type insured, and the necessary suspension of its business activities.

112.   In particular, since the onset of the Coronavirus and COVID-19, Burlington's revenues have declined, disrupting its business as well as the jobs and livelihoods of the over 50,000 associates who were employed by Burlington when the pandemic began. The human toll this has caused is inestimable.

113.   The financial toll on Burlington, however, is measurable and significant.

114.   Burlington's insurable business interruption and other losses, arising in connection with Coronavirus and COVID-19, are currently calculated to be in excess of $750 million.

## D.   Zurich Failed to Investigate or Cover Burlington's Claim for Insurance

115.   On December 28, 2020, Burlington presented a First Notice of Loss to Zurich in connection with Burlington's losses arising from the Coronavirus and COVID-19.

116.   Zurich acknowledged that First Notice of Loss the following day, assigning it Claim Number: 5630061488.

117.    On March 31, 2021, Burlington submitted its estimated claim for insurance to Zurich.

118.    Zurich has failed to respond to Burlington's claim for insurance.

119.    Zurich has not sent an adjuster – or anyone on its behalf – to visit, inspect or set foot in any Burlington stores or distribution centers or to otherwise investigate Burlington's claim for insurance.

120.    Upon information and belief, Zurich has not conducted any investigation into Burlington's claim for insurance.

## FIRST COUNT
## DECLARATORY JUDGMENT

121.    Burlington repeats and realleges each and every allegation set forth above as though fully set forth herein.

122.    Burlington seeks a declaration that Zurich is obligated, in accordance with the terms of the Zurich All Risks Policies, to provide insurance coverage for the losses sustained by Burlington as set forth herein.

123.    An actual and justifiable controversy exists between the parties with respect to this issue because of Zurich's refusal to perform its obligations under the Zurich All Risks Policies.

124.    A declaration of the parties' rights and obligations under the Zurich All Risks Policies will serve to resolve the dispute between them.

**WHEREFORE**, Burlington demands judgment in its favor and against Zurich as follows:

(a)    declaring and adjudging the rights and obligations of the parties under the Zurich All Risks Policies;

(b)      granting Burlington money damages, including money damages available

as supplemental and further relief under N.J.S.A. 2A:16-60, in an amount to be determined at trial,

together with pre- and postjudgment interest;

(c)      requiring Zurich to pay Burlington's reasonable attorneys' fees in this

action;

(d)      requiring Zurich to repay Burlington for the costs of suit incurred herein;

and

(e)      providing for such other and further relief, including any appropriate

equitable relief, as the Court may deem just and proper.

### JURY DEMAND

Burlington hereby demands trial by jury on all issues so triable.


Respectfully submitted,

**FLASTER/GREENBERG PC**


Dated: May 18, 2021                    By:      */s/ John G. Koch*_____
                                                Lee M. Epstein, Esquire
                                                John G. Koch, Esquire
                                                Matthew A. Goldstein, Esquire
                                                1810 Chapel Avenue West
                                                Cherry Hill, New Jersey 08002
                                                Tel: (856) 661-1900
                                                Fax: (856) 661-1919
                                                lee.epstein@flastergreenberg.com
                                                john.koch@flastergreenberg.com
                                                matthew.goldstein@flastergreenberg.com
                                                *Attorneys for Plaintiff Burlington Stores,*
                                                *Inc.*

## RULE 4:5-1 CERTIFICATION

I certify, pursuant to Rule 4:5-1, that to the best of my knowledge, information and belief the matter in controversy is not the subject matter of any other action pending in any other court, nor of any pending arbitration proceeding, and no other action or arbitration is contemplated; further there are no other parties who should be joined in this action.

**FLASTER/GREENBERG PC**

By:  _/s/ John G. Koch_____
John G. Koch

## RULE 1:38-7 CERTIFICATION

I certify that confidential personal identifiers have been redacted from documents now submitted to the Court, and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

**FLASTER/GREENBERG PC**

By:  _/s/ John G. Koch_____
John G. Koch

# Exhibit B

P4685863

BURLINGTON STORES, INC.
PLAINTIFF
- vs -
ZURICH AMERICAN INSURANCE COMPANY
DEFENDANT

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION BURLINGTON COUNTY
Docket No. BUR-L-001053-21

**Person to be Served**
ZURICH AMERICAN INSURANCE COMPANY
C/O NEW JERSEY DEPARTMENT OF BANKING AND INSURANCE
20 WEST STATE STREET

TRENTON, NJ 08625

**AFFIDAVIT OF SERVICE**
(For Use By Private Service)

**Papers Served:** SUMMONS, CASE INFORMATION STATEMENT, COMPLAINT, JURY DEMAND, RULE 4:5-1 CERTIFICATION, RULE 1:38-7 CERTIFICATION, TRACK ASSIGNMENT NOTICE, CHECK, SELF ADDRESSED RETURN ENVELOPE AND EXHIBITS
**Service Data:**
Served Successfully **X** Not Served _____ Date: 05/26/2021 Time: 10:48 AM Attempts: _____

___ Delivered a copy to him/her personally

___ Left a copy with a competent household member of over 14 years of age residing therein.

**X** Left a copy with a person authorized to accept service, e.g. managing agent, registered agent, etc.

Name of person served and relationship / title:

DEBRA MULLEN

ADMINISTRATIVE ASSISTANT / AUTHORIZED TO ACCEPT

**Description of Person Accepting Service:**
SEX: **FEMALE**    COLOR: **WHITE**    HAIR: **BROWN**    APP.AGE: **43**    APP. HT: **5'7"**    APP. WT: **140**
OTHER:

**Comments Or Remarks:**

*Edward J. McDonald*
Sworn to before me this
26 day of May, 2021

I, CHARLES MONTELEONE, was at the time of service a competent adult not having a direct interest in the litigation. I declare under penalty of perjury that the foregoing is true and correct.

*Charles Monteleone*

Signature of Process Server                    Date

EDWARD J. McDONALD
NOTARY PUBLIC OF NEW JERSEY
COMMISSION # 50004842
MY COMMISSION EXPIRES 10/21/2024

Client File Number:

PM Legal
219 South Street STE 102
New Providence, NJ 07974
908-897-0273
FLASTER GREENBERG

# Exhibit C

Judiciary eCourts Public Access System - Civil Part

- Home
- Help
- Logout

CASE JACKET

User:publicaccess
Docket Number: BUR L 001053 - 21

| Back | | Create Summary Report |

Case Caption: Burlington Stores Inc Vs Zurich American Insurance

Court: Civil Part

Case Type: Other Insurance Claim (Including Declaratory Judgment Actions)

Case Track: I

# of Discovery Days: 150

Original Discovery End Date:

Original Arbitration Date:

Original Trial Date:

Disposition Date:

Venue: Burlington

Case Status: Active

Judge: James J Ferrelli

Age of Case: 00 YR 00 MO

Current Discovery End Date:

Current Arbitration Date:

Current Trial Date:

Case Disposition: Open

Case Initiation Date: 05/18/2021

Jury Demand: 12 Jurors

Team: 3

Consolidated Case: N

# of DED Extensions: 0

# of Arb Adjournments: 0

# of Trial Date Adjournments: 0

Statewide Lien:

- Plaintiffs (1)
- Defendants (1)
- Case Proceedings (1)
- ACMS Documents (3)
- Fees (3)

## Burlington Stores Inc

### Case Actions

| Filed Date | Filings | Docket Text | Transaction ID | Entry Date |
|---|---|---|---|---|
| 05/18/2021 | | Complaint with Jury Demand for BUR-L-001053-21 submitted by KOCH, JOHN GREGORY, FLASTER GREENBERG PC on behalf of BURLINGTON STORES, INC. against ZURICH AMERICAN INSURANCE CO | LCV2021124003 | 05/19/2021 |
| 05/20/2021 | | TRACK ASSIGNMENT Notice submitted by Case Management | LCV2021249373 | 05/20/2021 |
| 05/26/2021 | | AFFIDAVIT OF SERVICE submitted by KOCH, JOHN, GREGORY of FLASTER GREENBERG PC on behalf of BURLINGTON STORES INC against ZURICH AMERICAN INSURANCE CO | LCV2021298831 | 05/26/2021 |
| 05/26/2021 | | MOTION FOR ADMISSION PRO HAC VICE submitted by KOCH, JOHN, GREGORY of FLASTER GREENBERG PC on behalf of BURLINGTON STORES INC against ZURICH AMERICAN INSURANCE CO | LCV2021130011 6 | 05/26/2021 |
| 05/27/2021 | | The motion filed on 05/26/2021 will be decided on 06/11/2021. Do not come to the courthouse because no oral argument has been requested. The court's decision will be provided to you. Re: MOTION FOR ADMISSION PRO HAC VICE [LCV20211300116] | LCV2021130722 8 | 05/27/2021 |

Showing 1 to 5 of 5 entries

Screen ID : ECCV3000

**FLASTER/GREENBERG PC**
By:   Lee M. Epstein (*pro hac vice application forthcoming*)
       John G. Koch (Attorney No.: 042572005)
       Matthew A. Goldstein (Attorney No.: 029212010)
1810 Chapel Avenue West
Cherry Hill, New Jersey 08002
Tel: (856) 661-1900
Fax: (856) 661-1919
Email: lee.epstein@flastergreenberg.com
      john.koch@flastergreenberg.com
      matthew.goldstein@flastergreenberg.com
*Attorneys for Plaintiff Burlington Stores, Inc.*

| | |
|---|---|
| BURLINGTON STORES, INC., | SUPERIOR COURT OF NEW JERSEY |
| | LAW DIVISION |
| Plaintiff, | BURLINGTON COUNTY |
| v. | DOCKET NO.: |
| ZURICH AMERICAN INSURANCE COMPANY, | **COMPLAINT** |
| Defendant. | |

Plaintiff Burlington Stores, Inc. ("Burlington"), by its undersigned counsel, Flaster/Greenberg PC, hereby submits its Complaint against Defendant Zurich American Insurance Company ("Zurich"), and in support thereof, avers as follows:

## I.    <u>INTRODUCTION</u>

1.    This action for declaratory judgment, and for related supplemental and further relief, arises out of an insurance coverage dispute between Burlington and Zurich.

2.    Burlington is a nationally recognized off-price retailer with over 780 stores in 45 states and Puerto Rico. Burlington's stores offer an extensive selection of in-season, fashion-focused merchandise, including women's ready-to-wear apparel, menswear, youth apparel, baby, beauty, footwear, accessories, home, toys, and coats.

3.      Further to its prudent business practices, and in recognition of its responsibilities to its associates (*i.e.*, employees), stockholders and customers, Burlington maintains various forms of insurance coverage.

4.      Specifically, Burlington purchased "All Risks" commercial property insurance policies from Zurich (the "Zurich All Risks Policies," as defined below) insuring against commonly occurring risks such as fire, as well as unanticipated and novel risks such as the SARS-CoV2 virus ("Coronavirus") and the disease it causes, Coronavirus Disease 2019 ("COVID-19").

5.      On March 11, 2020, the World Health Organization ("WHO") declared the COVID-19 outbreak a global pandemic.

6.      To date, there have been over 163 million confirmed cases of COVID-19 (over 32.7 million of them in the United States alone) and over 3.3 million deaths worldwide.[1]

7.      Burlington was not immune from the Coronavirus pandemic with many of its associates reporting cases of COVID-19.

8.      To combat the rapid spread of COVID-19 and to protect its customers, associates, and property, Burlington began closing certain stores and, effective March 22, 2020, Burlington closed all of its stores, distribution centers (other than processing of received inventory), and corporate offices.

9.      At the same time, state and local governments across the United States and governments around the world recognized the unprecedented and mushrooming outbreaks of COVID-19 and the Coronavirus' catastrophic impact through the direct physical loss of or damage

---

[1] *Coronavirus Disease 2019: COVID-19 Data Tracker,* CDC (updated May 17, 2021), https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited May 18, 2021); *WHO Coronavirus Disease (COVID-19) Dashboard*, WHO (updated May 18, 2021), https://covid19.who.int/ (last visited May 18, 2021).

to property and lives. As a consequence, many states issued "State of Emergency" Declarations, beginning in March 2020.

10.     Virtually every U.S. state where there was a Burlington store issued orders suspending or severely limiting business operations deemed to be "non-essential businesses" where people could potentially contract COVID-19 from others or from the property itself.

11.     The suspension of Burlington's business activities, consistent with the governmental mandates, precluded access to Burlington's stores, all of which are insured "Locations" under the Zurich All Risks Policies.

12.     As a result, Burlington sustained considerable business interruption and other losses and costs (currently calculated to be in excess of $750 million), for which it made a claim for insurance under the Zurich All Risks Policies.

13.     Zurich failed to honor its promise to insure Burlington under the Zurich All Risks Policies for the losses and costs that Burlington has sustained.

14.     Burlington therefore seeks a judicial declaration for the purpose of resolving this insurance coverage dispute that is centered in this county, where Burlington maintains its headquarters, where the Zurich All Risks Policies were procured by and delivered to Burlington, and where Burlington managed its claim for insurance through its Legal and Risk Management Departments.

## II.    PARTIES

15.     Burlington is a Delaware corporation with its principal place of business in Burlington, New Jersey.

16.     Based on information and belief, Zurich is a New York corporation with its principal place of business in Schaumburg, Illinois.

### III.   JURISDICTION AND VENUE

17.    This Court has jurisdiction pursuant to the New Jersey Declaratory Judgment Act, N.J.S.A. 2A:16-50 *et seq.*, to issue declaratory relief regarding the parties' respective rights and obligations under the Zurich All Risks Policies sold by Zurich to Burlington.

18.    This Court has personal jurisdiction over Zurich as it is licensed to issue insurance policies in the State of New Jersey, regularly does business within the State of New Jersey, and issued the Zurich All Risks Policies to Burlington in New Jersey.

19.    Venue in this Court is proper pursuant to New Jersey Court Rules 4:3-2(a) and 4:3-2(b) because Zurich does business by issuing insurance policies throughout the State of New Jersey, including in Burlington County, and may be served in Burlington County by service upon the Commissioner of Banking and Insurance. Venue is also proper pursuant to Rule 4:3-2(a)(3)-(b) because Burlington is a corporation that has a registered office, is doing business, and resides in Burlington County, New Jersey.

### IV.   FACTUAL BACKGROUND

**A.    The Zurich All Risks Policies**

##### *"All Risks" Insurance is "Special" and "Very Broad"*

20.    In exchange for the payment of substantial premiums, Zurich sold Burlington two "All Risks" First Party Property and Time Element insurance policies: Policy Number XPP0239022-01, effective from April 1, 2019 to April 1, 2020 and Policy Number XPP0239022-02, effective from April 1, 2020 to April 1, 2021 (collectively, the "Zurich All Risks Policies").

21.    The terms and conditions of the Zurich All Risks Policies are fully incorporated herein by reference.

-4-

22.     "All Risks" insurance is a special type of insurance extending to risks not usually contemplated and covering all fortuitous losses unless expressly excluded.

23.     The Zurich All Risks Policies incorporate the Zurich Edge Policy Form.

24.     Zurich marketed the Zurich Edge Policy Form as offering uniquely "broader coverage and greater flexibility[.]"[2]

25.     Zurich made the same promotional claims to insurance regulators. In an Explanatory Memorandum filed with the California Department of Insurance and the Oregon Insurance Division on January 11, 2008 and February 5, 2008, respectively, Zurich claimed that the Zurich Edge Policy Form offers "our Insured's [sic] a very broad and flexible policy."

### *The Zurich All Risks Policies Insure Burlington Against Loss or Damage Caused by a "Covered Cause of Loss"*

26.     The Insuring Agreement of the Zurich All Risks Policies provides: "This Policy Insures against direct physical loss of or damage caused by a **Covered Cause of Loss**[3] to Covered Property. . . ."

27.     "**Covered Cause of Loss**" is defined in the Zurich All Risks Policies as: "All risks of direct physical loss of or damage from any cause unless excluded."

28.     The term "direct" is not defined in the Zurich All Risks Policies and may be defined reasonably as: "proceeding from one point to another in time or space without deviation or interruption: STRAIGHT."[4]

---

[2] *Zurich introduces The Zurich Edge$^{TM}$ for highly protected risks and global property markets*, Media Release Zurich (Apr. 22, 2008), https://zsl.zurichna.com/zus/zna_config.nsf/pages/9123da88864cd81485257433006ed710!Open Document&Click=#:~:text=global%20property%20markets- (last visited May 18, 2021).

[3] Unless otherwise noted, capitalized and bolded terms herein are capitalized and bolded in the Policies.

[4] *Direct*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/direct (last visited May 18, 2021).

29.     The term "physical" is not defined in the Zurich All Risks Policies and may be defined reasonably as: "[r]elating to things perceived through the senses as opposed to the mind; tangible or concrete."[5]

30.     The term "loss" is not defined in the Zurich All Risks Policies and may be defined reasonably as: "the act of losing possession: DEPRIVATION."[6]

31.     The term "damage" is not defined in the Zurich All Risks Policies and may be defined reasonably as: "[p]hysical harm caused to something in such a way as to impair its value, usefulness, or normal function."[7]

32.     Burlington's losses resulted from "loss of or damage" to either Covered Property, or to Property of the type insurable under the Zurich All Risks Policies, when the Coronavirus and COVID-19 caused a loss of or a deprivation of insured property and otherwise impaired the functionality of such property.

33.     The "loss of or damage" to Covered Property, or to other Property of the type insurable under the Zurich All Risks Policies, resulting from the Coronavirus and COVID-19 was "direct" in that it was without deviation or interruption.

34.     The "loss of or damage" to Covered Property, or to other Property of the type insurable under the Zurich All Risks Policies, resulting from the Coronavirus and COVID-19 was "physical" in that it was tangible, concrete and capable of being perceived through the senses as opposed to the mind.

---

[5] *Physical*, OXFORD ENGLISH DICTIONARY, https://www.lexico.com/en/definition/physical (last visited May 18, 2021).

[6] *Loss*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/loss (last visited May 18, 2021).

[7] *Damage*, OXFORD ENGLISH DICTIONARY, https://www.lexico.com/en/definition/damage (last visited May 18, 2021).

35.     The Zurich All Risks Policies insure Burlington against Property Damage and Time Element[8] Loss, and provide other Special Coverages.

36.     With regard to Property Damage, the Zurich All Risks Policies insure Burlington's Covered Property, including Burlington's interest in real and personal property.

37.     With regard to Time Element Loss, the Zurich All Risks Policies cover loss resulting from "the necessary **Suspension** of the Insured's business activities at an Insured Location."

38.     The terms **Suspension (Suspended)** are defined in the Zurich All Risks Policies, in pertinent part, as: "The slowdown or cessation of the Insured's business activities."

39.     The Time Element coverages of the Zurich All Risks Policies include, in pertinent part:

- **Gross Earnings:** as determined by the "Gross Earnings value that would have been earned during the Period of Liability, less charges and expenses that do not necessarily continue during the Period of Liability."

- **Extra Expense**:  defined to mean "that amount spent to continue the Insured's business activities over and above the expenses the Insured would have normally incurred had there been no direct physical loss of or damage caused by a **Covered Cause of Loss** to Property of the type insurable under this policy at a **Location**."

- **Leasehold Interest:** pursuant to which, Zurich promised to pay Burlington "the present value of the actual rent payable for the unexpired term of the lease" if the building (or structure) becomes wholly untenantable or unusable and "the present value of the proportionate amount of the actual rent payable for the unexpired term of the lease" if the building (or structure) becomes partially untenantable or unusable.

---

[8] "Time Element Insurance" is defined as "a property insurance term referring to coverage for loss resulting from the inability to put damaged property to its normal use. This type of coverage is called 'time element' insurance because the amount of loss depends on how long it takes to repair or replace the damaged property. The best-known types of time element insurance are business interruption and extra expense coverage." *Time Element Insurance*, INTERNAL RISK MANAGEMENT INSTITUTE, https://www.irmi.com/term/insurance-definitions/time-element-insurance (last visited May 18, 2021).

- **Extended Period of Liability**: pursuant to which Zurich agreed that upon termination of the coverage for Gross Earnings loss, the Zurich All Risks Policies "will continue to pay the actual Gross Earnings loss sustained by the Insured" for up to 365 days.

40.    The Zurich All Risks Policies also include numerous Special Coverages that apply to Burlington's losses, including the following:

- CIVIL OR MILITARY AUTHORITY coverage for "the actual Time Element loss sustained by the Insured, as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** is caused by order of civil or military authority that prohibits access to the **Location**."

- CONTINGENT TIME ELEMENT coverage for "the actual Time Element loss as provided by the Policy, sustained by the Insured during the Period of Liability directly resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** results from direct physical loss of or damage caused by a **Covered Cause of Loss** to Property (of the type insurable under this Policy) at **Direct Dependent Time Element Locations**, **Indirect Dependent Time Element Locations**, and **Attraction Properties** located worldwide[.]"

- DECONTAMINATION COSTS coverage, which provides in relevant part: "If Covered Property is **Contaminated** from direct physical loss of or damage caused by a **Covered Cause of Loss** to Covered Property and there is in force at the time of the loss any law or ordinance regulating **Contamination** due to the actual not suspected presence of **Contaminant(s)**, then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such **Contaminated** Covered Property in a manner to satisfy such law or ordinance."

- INGRESS/EGRESS coverage for "the actual Time Element loss sustained by the Insured, as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if ingress or egress to that Insured Location by the Insured's suppliers, customers or employees is prevented by physical obstruction due to direct physical loss of or damage caused by a **Covered Cause of Loss** to property not owned, occupied, leased or rented by the Insured or insured under this Policy and located within the distance of the Insured Location as stated in the Declarations."

*__The Zurich All Risks Policies Obligated Burlington to Protect and Preserve its Property from Loss or Damage and Insured Burlington for the Associated Losses and Costs__*

41.    The Zurich All Risks Policies provide PROTECTION AND PRESERVATION OF PROPERTY coverage, for "[t]he reasonable and necessary costs incurred for actions to temporarily protect or preserve Covered Property; provided such actions are necessary due to actual or imminent physical loss or damage due to a **Covered Cause of Loss** to such Covered Property" and "[t]he Gross Earnings loss sustained by the Insured for a period of time not to exceed the hours listed in the Declarations prior to and after the Insured first taking reasonable action for the temporary protection and preservation of Covered Property."

42.    Separately, under a policy condition entitled, "DUTIES IN THE EVENT OF LOSS OR DAMAGE," the Zurich All Risks Policies obligated Burlington to mitigate its loss to its property:

> Take all reasonable steps to protect the Covered Property from further damage caused by a **Covered Cause of Loss**. If feasible, set the damaged property aside and in the best possible order for examination. Also, keep a record of expenses for emergency and temporary repairs for consideration in the settlement of the claim.

43.    The suspension of Burlington's business activities, including the closure of Burlington's stores, distribution centers and other properties, and then reopening only with significant modifications, was necessary for the protection and preservation of Covered Property required under the Zurich All Risks Policies and the losses and costs resulting from that necessary suspension are insured.

*__No Exclusion Applies__*

44.    The Zurich All Risks Policies also contain various exclusions, none of which apply in this case.

45.     Specifically, the Zurich Edge Policy Form contains a so-called Contamination Exclusion that was deleted by endorsement to the Zurich All Risks Policies and is otherwise inapplicable.

46.     The Contamination Exclusion set forth in the Zurich Edge Policy Form provides as follows: "**Contamination**, and any cost due to **Contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy, except as provided by the Radioactive Contamination Coverage of this Policy."

47.     The Contamination Exclusion set forth in the Zurich Edge Policy Form was deleted from the Zurich All Risks Policies by endorsement (the "Virus Deletion Endorsement") and replaced with the following provision: "**Contamination** or asbestos, and any cost due to **Contamination** or asbestos including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy." *See* Policy Endorsement, form EDGE-219-C (01/18).

48.     The Zurich Edge Policy Form defines **Contamination(Contaminated)** as: "Any condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, **Fungus**, mold or mildew."

49.     The definition of **Contamination(Contaminated)** set forth in the Zurich Edge Policy Form was deleted from the Zurich All Risks Policies by the Virus Deletion Endorsement and replaced with the following: "Any condition of property due to the actual presence of any **Contaminant(s)**."

50.     The definition of **Contaminant(s)** set forth in the Zurich Edge Policy Form in each of the Zurich All Risks Policies was also deleted from the Zurich All Risks Policies by the Virus Deletion Endorsement and replaced with the following: "Any solid, liquid, gaseous, thermal or

other irritant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), other hazardous substances, **Fungus** or **Spores**."

51.   The Zurich All Risks Policies, as amended by the Virus Deletion Endorsement, thereby delete the reference to, among other things, "virus" from the Contamination Exclusion.

52.   The Virus Deletion Endorsement applies to all risks insured under the Zurich All Risks Policies without regard to the location of those risks.

53.   The Virus Deletion Endorsement changes the Zurich All Risks Policies in their entirety, providing in bolded, all capitalized lettering: "**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**" (Emphasis in original.)

54.   Other endorsements to the Zurich All Risks Policies, however, are expressly and unambiguously limited only to risks located in a specified state.

55.   For example, the Zurich All Risks Policies contain a New York state-titled endorsement, entitled "Amendatory Endorsement – New York," which provides: "**THIS ENDORSEMENT CHANGES THE POLICY AND APPLIES TO THOSE RISKS IN NEW YORK.**" (Emphasis in original.)

56.   Similarly, the Zurich All Risks Policies contain a Connecticut state-titled endorsement, entitled "Amendatory Endorsement – Connecticut," which provides: "**THIS ENDORSEMENT CHANGES THE POLICY AND APPLIES TO THOSE RISKS IN CONNECTICUT.**" (Emphasis in original.)

57.   Upon information and belief, when Zurich sold the Zurich All Risks Policies to Burlington, Zurich knew that the Virus Deletion Endorsement applied policy wide and contained no geographical limitation.

58.     Upon information and belief, Zurich knew that losses resulting from viruses and pandemics were covered under the Zurich Edge Policy Form in the absence of a clear and express exclusion for viruses.

59.     Upon information and belief, in deleting the Contamination Exclusion and replacing it with the Virus Deletion Endorsement, Zurich knew that an exclusion addressed to "contamination" is not a proper method for barring coverage for losses resulting from viruses.

60.     Knowing that an exclusion addressed to "contamination" was an improper method for excluding losses resulting from viruses, Zurich removed the reference to virus from the scope of the Contamination Exclusion when it issued the Zurich All Risks Policies to Burlington.

61.     Specifically, in 2011, Zurich submitted a revised version of the Zurich Edge Policy Form to the Louisiana Insurance Department (the "Department") for approval. The Department objected to several provisions in Zurich's revised form, including the Contamination Exclusion, stating in an Explanatory Memorandum that by the inclusion of health hazards such as "pathogens . . . bacteria and virus" within the definition of "Contamination," the base form's version of the Contamination Exclusion went beyond the scope of what was appropriate for an exclusion for contamination." A true and correct copy of the referenced filing is attached hereto as **Exhibit A** and is incorporated by reference.

62.     The Explanatory Memorandum states:

> This Department views pollutants as substances that damage the natural environment when accidentally spilled, leaked, or discharged. **Hence, the presence of products such as ... mold, mildew, and bacteria and virus that lead to disease or health hazards do not fit our definition of pollutants and should not be included in the text of a pollution exclusion or referred to as examples of pollutants**.

Exhibit A at 13 (emphasis added).

63.     The Explanatory Memorandum states further that, if Zurich wished to exclude losses resulting from health hazards, it should create separate exclusions for such losses, because it is not appropriate to exclude them by way of a contamination/pollution exclusion:

> Damages relating to these types of products and health hazards **MAY** be excluded from coverage, but they should not be included within a pollution exclusion. It is recommended to create separate exclusions and definitions for contaminants such as fungus, mold, asbestos, spores, bacteria, virus, biological substances, medical waste and products that may lead to disease [if Zurich wanted to exclude those risks].

Exhibit A at 13 (capitalization in original; emphasis added).

64.     This approach is consistent with long standing precedent in New Jersey, holding that pollution exclusions should only be used to exclude "traditional pollutants" like industrial hazardous wastes. *See, e.g., Nav-Its Inc. v. Selective Ins. Co. of Am.*, 183 N.J. 110, 123-24 (2005); *Byrd ex rel. Byrd v. Blumenreich*, 317 N.J. Super. 496, 503 (App. Div. 1999).

65.     Zurich did not create a separate exclusion for viruses and instead removed the reference to virus from the Contamination Exclusion by endorsing the Zurich All Risks Policies with the Virus Deletion Endorsement.

66.     Upon information and belief, when Zurich sold the Zurich All Risks Policies to Burlington it knew that standard-form exclusions for pandemic risks were available in the insurance marketplace.

67.     Upon information and belief, Zurich sold insurance policies to other insureds that included such exclusions.

68.     Given the liability that insurers, including Zurich, faced for losses from pandemics, shortly after the outbreak of SARS in 2003, the insurance industry undertook to draft broad exclusions to bar coverage for losses from viruses and bacteria.

69.     In 2006, the Insurance Services Office, Inc. ("ISO"),[9] the insurance industry's insurance policy drafting organization, promulgated a specific exclusion for losses caused by a virus.

70.     On July 6, 2006, ISO prepared a circular that included a standard exclusion of loss due to viruses and bacteria as part of its filing with state insurance regulators.[10] In that circular, ISO noted that examples of "viral and bacterial contaminants are rotavirus, SARS, [and] influenza," observing, "[t]he universe of disease-causing organisms is always in evolution."[11]

71.     ISO recognized that viruses could cause property damage, including business interruption losses, stating:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. **When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses.**[12]

---

[9] "ISO is a nonprofit trade association that provides rating, statistical, and actuarial policy forms and related drafting services to approximately 3,000 nationwide property or casualty insurers. Policy forms developed by ISO are approved by its constituent insurance carriers and then submitted to state agencies for review. Most carriers use the basic ISO forms, at least as the starting point for their general liability policies." *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 671 n.13 (1995) (citations omitted).

[10] ISO Circular, "*New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria*," (July 6, 2006), https://www.propertyinsurancecoveragelaw.com/files/2020/03/ISO-Circular-LI-CF-2006-175-Virus.pdf (last visited May 18, 2021).

[11] *Id.*

[12] *Id.* (emphasis added); *see also* https://www.propertyinsurancecoveragelaw.com/2021/05/articles/insurance/iso-internal-documents-are-important-regarding-covid-litigation/ (last visited May 18, 2021).

72.     Upon information and belief, Zurich and the rest of the insurance industry have long known that the presence of a virus on or around property can constitute direct physical loss of or damage to property.

73.     Zurich sold the Zurich All Risks Policies to Burlington without any exclusion applicable expressly to the loss or damage arising from pandemics generally, or from viruses specifically.

**B.      The Coronavirus Pandemic and the Resulting Loss of or Damage to Property and the Necessary Suspension of Burlington's Business Activities**

***The Coronavirus and COVID-19***

74.     The Coronavirus causes serious systemic illness and death.

75.     COVID-19 is a severe infectious disease caused by the Coronavirus.

76.     According to the WHO, "[t]he disease spreads primarily from person to person through small droplets from the nose or mouth, which are expelled when a person with COVID-19 coughs, sneezes, or speaks . . . . People can catch COVID-19 if they breathe in these droplets from a person infected with the virus . . . . These droplets can land on objects and surfaces around the person such as tables, doorknobs and handrails. People can become infected by touching these objects or surfaces, then touching their eyes, nose or mouth."[13]

77.     New Jersey experienced a reported COVID-19 outbreak beginning in March 2020 and became an epicenter of sickness, death, and property damage caused by the Coronavirus and COVID-19.[14]

_____

[13] *Q&A on coronaviruses (COVID-19)*, WHO (Apr. 17, 2020), https://web.archive.org/web/20200506094904/https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses (last visited May 18, 2021).

[14] *COVID-19 Vaccination Plan: New Jersey*, N.J. DEPT. HEALTH (Dec. 15, 2020),

-15-

## *The Coronavirus Causes Direct Physical Loss of or Damage to Property*

78.     The presence of the Coronavirus in and on property, including indoor air, surfaces, and objects, causes direct physical loss of or damage to property by altering property and rendering it incapable of being used for its intended purpose, untenantable, and uninhabitable.

79.     With regard to indoor spaces, the Centers for Disease Control ("CDC") has recommended "ventilation interventions" to help reduce exposure to the airborne Coronavirus, including increasing airflow and air filtration (such as with high-efficiency particulate air (HEPA) fan/filtration systems).[15]

80.     "Fomites" are physical objects or materials that carry and are capable of transmitting infectious agents, altering these objects to become vectors of disease.[16]

81.     Fomite transmission has been demonstrated as highly efficient for viruses, both from object-to-hand and from hand-to-mouth.[17]

82.     In addition, while fomite transmission may not be the primary route of transmission for COVID-19, fomite transmission is important and has been estimated to be responsible for up to 25% of all deaths due to COVID-19 since lockdowns were imposed.[18]

---

https://nj.gov/health/legal/covid19/NJ%20Interim%20COVID-19%20Vaccination%20Plan%20-%20Revised%2012-15-20.pdf (last visited May 18, 2021).

[15] *Ventilation in Buildings*, CDC (updated Mar. 23, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/ventilation.html#:~:text=HEPA%20filters%20are%20even%20more,with%20SARS%2DCoV%2D2 (last visited May 18, 2021).

[16]     *See, e.g., Fomite*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/fomite (last visited May 18, 2021).

[17] Jing Cai et al., *Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020*, 26 EMERGING INFECTIOUS DISEASES 6 (June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article (last visited May 18, 2021).

[18] A. Meiksin, *Dynamics of COVID-19 transmission including indirect transmission mechanisms: a mathematical analysis*, 148 EPIDEMIOLOGY & INFECTION e257, 1-7 (Oct. 20, 2020), https://www.cambridge.org/core/journals/epidemiology-and-infection/article/dynamicsof-

83.     The WHO has described fomite transmission as follows:

> Respiratory secretions or droplets expelled by infected individuals can contaminate surfaces and objects, creating fomites (contaminated surfaces). **Viable SARS-CoV-2 virus and/or RNA detected by RT-PCR can be found on those surfaces for periods ranging from hours to days,** depending on the ambient environment (including temperature and humidity) and the type of surface, in particular at high concentration in health care facilities where COVID-19 patients were being treated. Therefore, transmission may also occur indirectly through touching surfaces in the immediate environment or objects contaminated with virus from an infected person[.][19] (Emphasis added.)

84.     Fomites transform the surface of property into a potentially deadly Coronavirus transmission device.

85.     The WHO's description of fomite transmission of COVID-19 expressly recognizes this physical alteration of property, describing viral droplets as "**creating** fomites (contaminated surfaces)."[20] (Emphasis added.)

86.     "Creating" involves making or bringing into existence something new[21] – such as something that is in an altered state from what it was before the Coronavirus was present on, in, and around the property.

87.     The presence of Coronavirus in and on property, including indoor air, surfaces, and objects, renders the property lost, unsafe and unfit for its normal usage and otherwise untenantable and uninhabitable.

---

covid19-transmission-including-indirect-transmission-mechanisms-a-mathematicalanalysis/A134C5182FD44BEC9E2BA6581EF805D3 (last visited May 18, 2021).

[19] *Transmission of SARS-CoV-2: implications for infection prevention precautions*, WHO (July 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited May 18, 2021).

[20] *Id.*

[21] *Create*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/create (last visited May 18, 2021).

***The Governmental Emergency Declarations and Orders Recognized the Imminent
Threat and the Actual Loss of or Damage to Property Posed by the Coronavirus***

88.     In order to stop the spread of COVID-19, governmental bodies throughout the
United States issued emergency declarations and orders.

89.     Those emergency declarations and orders recognized that the Coronavirus harms
property as well as people and cannot be easily wiped off surfaces.

90.     For example, on March 16, 2020, Governor Jay Inslee issued an order closing
fitness centers, theaters, and indoor dining (and certain other business) in Washington State.[22] That
order cautioned that COVID-19 was a "public disaster affecting. . . property"; that state
government agencies were working with local health officials "in alleviating the impacts to . . .
property"; and that among its objectives was to "help preserve and maintain . . . property[.]"[23]

91.     On the same day, New Orleans Mayor Latoya Cantrell  issued an emergency order
suspending large gatherings and closing certain categories of businesses, stating "there is reason
to believe that COVID-19 may be spread amongst the population by various means of exposure,
including the propensity to spread person to person and **the propensity to attach to surfaces for
prolonged periods of time, thereby spreading from surface to person and causing property
loss and damage** in certain circumstances[.]"[24] In addition, the emergency order provided that
"imminent and emergency action must be taken to mitigate the effects of COVID-19 . . . and

---

[22] *Proclamation by the Governor Amending Proclamation 20-05*, OFF. GOVERNOR, No. 20-13 (Mar.
16,          2020),          https://www.governor.wa.gov/sites/default/files/proclamations/20-
13%20Coronavirus%20Restaurants-Bars%20%28tmp%29.pdf (last visited May 18, 2021).

[23] *Id.*

[24] *Mayoral Proclamation to Promulgate Emergency Orders During the State of Emergency Due
to COVID-19*, CITY DIST. CT. FOR THE PARISH OF ORLEANS, No. 2020-02602 (Mar. 16, 2020),
https://nola.gov/mayor/executive-orders/emergency-declarations/03162020-mayoral-
proclamation-to-promulgate-emergency-orders-during-the-state-of-emergency-due-to-co/     (last
visited May 18, 2021).

**preserve the lives and property of the people of the City of New Orleans**[.]"[25] (Emphasis added.)

92.     Also on March 16, 2020, New York City Mayor Bill de Blasio issued an emergency executive order closing non-essential businesses in the city and declaring, "this order is given because of the propensity of the virus to spread person to person and also **because the virus physically is causing property loss and damage**[.]"[26] (Emphasis added.)

93.     On March 19, 2020, Los Angeles Mayor Eric Garcetti issued a shutdown order, explaining "[t]his Order is given because, among other reasons, the COVID-19 virus can spread easily from person to person and **it is physically causing property loss or damage due to its tendency to attach to surfaces for prolonged periods of time**."[27] (Emphasis added.)

94.     On March 22, 2020, Broward County, Florida issued Emergency Order 20-01 stating that the Order is "necessary because of the propensity of the virus to spread person to person and also because the **virus is physically causing property damage due to its proclivity to attach to surfaces for prolonged periods of time**[.]"[28] (Emphasis added.)

95.     Also on March 22, 2020, Philadelphia Mayor Jim Kenney issued Emergency Order No. 2 stating, "COVID-19 may remain viable for hours to days on surfaces made from a variety

---

[25] *Id.*

[26]   *Emergency Executive Order No. 100*, OFF. MAYOR, (Mar. 16, 2020), https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-100.pdf (last visited May 18, 2021).

[27] *Public Order Under City of Los Angeles Emergency Authority*, OFF. MAYOR (Mar. 19, 2020, revised May 27, 2020), https://www.lamayor.org/sites/g/files/wph1781/files/page/file/20200527%20Mayor%20Public%20Order%20SAFER%20AT%20HOME%20ORDER%202020.03.19%20%28REV%202020.05.27%29.pdf (last visited May 18, 2021).

[28]   *Broward County Administrator's Emergency Order 20-01* (Mar. 22, 2020), https://www.broward.org/CoronaVirus/Documents/BerthaHenryExecutiveOrder20-01.pdf (last visited May 18, 2021).

of materials located in businesses and other places, thus **contaminating certain property and places**[.]"[29] (Emphasis added.)

96.     Louisiana Governor John Bel Edwards issued Stay at Home and Closure Orders that were in effect from March 23, 2020 to May 15, 2020, requiring all individuals within the state to stay at home unless performing essential activities and requiring non-essential businesses to close to the public. In Proclamation No. 33 JBE 2020, Governor Edwards specifically acknowledged that "these measures relating to closure of certain businesses and to limit the operations of non-essential businesses are necessary because of the **propensity of the COVID-19 virus to spread . . . due to its ability to attach to surfaces for prolonged periods of time**[.]"[30] (Emphasis added.)

97.     On March 26, 2020, Colorado Governor Jared Polis' Executive Order D 2020 017 and the Colorado Department of Public Health and Environment's ("CDPHE") Second Updated Public Health Order 20-24 became effective, requiring all residents to stay at home unless performing essential activities and requiring all non-critical businesses to close to the public. The CDPHE's updated Order 20-24 specifically acknowledged that "COVID-19 also **physically contributes to property loss . . . and damage** due to its propensity to attach to surfaces for prolonged periods of time" and "[t]his [Order] **helps to reduce the property damage caused by**

---

[29] *Emergency Order Temporarily Prohibiting Operation of Non-Essential Businesses and Congregation of Persons to Prevent the Spread of 2019 Novel Coronavirus (COVID-19)*, OFF. MAYOR, Order No. 2 (Mar. 22, 2020), https://www.phila.gov/media/20200322130746/Order-2-Business-And-Congregation-Prohibition-Stay-At-Home.pdf (last visited May 18, 2021).

[30] *Additional Measures for COVID-19 Stay at Home*, EXEC. DEPT., No. 33 JBE 2020 (Mar. 22, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/JBE-33-2020.pdf (last visited May 18, 2021).

**COVID-19** and preserves the welfare of our residents by reducing the spread of the disease in our communities and our workplaces[.]"[31] (Emphasis added.)

98.    On April 10, 2020, in a supplement to a mayoral proclamation, San Francisco Mayor London Breed extended coronavirus-related orders and stated, "[t]his order and the previous orders issued during this emergency have all been issued because of the propensity of the virus to spread person to person and also because **the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time**[.]"[32] (Emphasis added.)

99.    On April 23, 2020, Dallas County Judge Clay Jenkins issued an amended "Safer At Home Order" that states, "this Emergency Order is necessary because of the propensity of **the virus to spread person to person and also because the virus is physically causing property damage due to its proclivity to attach to surfaces for prolonged periods of time**[.]"[33] (Emphasis added.)

100.    On April 29, 2020, Nevada Governor Steve Sisolak issued Emergency Directive 016 recognizing the threat SARS-CoV-2 poses to property, stating "the ability of the novel coronavirus that causes COVID-19 to survive on surfaces for indeterminate periods of time

---

[31] *Updated Public Health Order 20-24 Implementing Stay at Home Requirements*, COLO. DEPT. OF PUB.    HEALTH    &    ENV'T,    (Mar.    26,    2020), https://covid19.colorado.gov/sites/covid19/files/Updated%20Public%20Health%20Order%20- %20Authorized%20Business.32620.pdf (last visited May 18, 2021).

[32] *Ninth Supplement to Mayoral Proclamation Declaring the Existence of a Local Emergency Dated    February    25,    2020*,    OFF.    MAYOR    (Apr.    10,    2020), https://sfmayor.org/sites/default/files/NinthMayoralSupplement.pdf (last visited May 18, 2021).

[33]    *Amended    Order    of    County    Judge    Clay    Jenkins*    (Apr.    23,    2020), https://www.dallascounty.org/Assets/uploads/docs/covid-19/orders-media/2020/april/042320- DallasCountyOrder.pdf (last visited May 18, 2021).

renders some property unusable and contributes to . . . damage, and property loss[.]"[34]

(Emphasis added.)

101.    On June 26, 2020 Governor Phil Murphy issued Executive Order 157 permitting the limited reopening of retail establishments subject to restrictions such as a capacity limit of "50% of the stated maximum store capacity" and other workplace safeguards.[35] These limitations were expressly issued, among other reasons, to protect against fomite transmission of the Coronavirus, and explicitly addressed the Coronavirus' impacts upon property in numerous ways, including, but not limited to, requiring businesses to:

- conduct "frequent sanitization of high-touch areas";

- "[c]lean and disinfect equipment that is rented in accordance with CDC and [Department of Health] guidelines" – that is, more arduous, extensive and stringent cleaning and disinfecting standards than those in the ordinary course of those activities;

- "[c]lean and disinfect the worksite in accordance with CDC guidelines when a worker at the site has been diagnosed with COVID-19 illness"; and

- "[r]outinely clean and disinfect all high-touch areas" including "common surfaces, safety equipment, and other frequently touched surfaces[.]"[36]

### *The Coronavirus Cannot be Removed or Eliminated by Routine Cleaning*

102.    An indoor space exposed to the Coronavirus cannot be made safe and fit for its intended use by routine surface cleaning.

---

[34]  *Declaration of Emergency Directive 016*, OFF. GOVERNOR (Apr. 29, 2020), https://gov.nv.gov/News/Emergency_Orders/2020/2020-04-29_-_COVID-19_Declaration_of_Emergency_Directive_016_(Attachments)/ (last visited May 18, 2021).

[35] *Executive Order No. 157*, OFF. GOVERNOR (June 26, 2020), https://www.nj.gov/infobank/eo/056murphy/pdf/EO-157.pdf (last visited May 18, 2021).

[36] *Id.*

103.   The CDC recently released guidance stating that there is little evidence to suggest that routine use of disinfectants can prevent the transmission of the Coronavirus from fomites in community settings.[37]

104.   The CDC concluded that, according to a more quantitative microbial risk assessment study, "surface disinfection once- or twice-per-day had little impact on reducing estimated risks" of Coronavirus transmission.[38]

105.   A number of other studies indicate that the Coronavirus is "much more resilient to the cleaning than most other respiratory viruses so tested."[39]

106.   With respect to textiles – a significant component of the merchandise sold at Burlington's stores – studies have demonstrated that the virus can survive on fabrics and be transferred to skin and other surfaces, "suggesting it is biologically plausible that . . . infectious diseases can be transmitted directly through contact with contaminated textiles."[40]

107.   Aerosolized Coronavirus particles and virions cannot be eliminated by routine surface cleaning and in some cases cleaning contaminated surfaces (*i.e.*, floors) could reasonably result in re-aerosolization of the Coronavirus.

---

[37] *Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments*, CDC (updated Apr. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html (last visited May 18, 2021).

[38] *Id.* (citing A. K. Pitol & T. R. Julian, *Community transmission of SARS-CoV-2 by fomites: Risks and risk reduction strategies*, ENVTL. SCI. & TECH. LETTERS (2020)).

[39] Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates*, 92 J. MED. VIROLOGY 11, 2498-510 (June 10, 2020), https://onlinelibrary.wiley.com/doi/10.1002/jmv.26170 (last visited May 18, 2021).

[40] Lucy Owen & Katie Laird, *The role of textiles as fomites in the healthcare environment: a review of the infection control risk*, 8 PEER J. LIFE & ENV'T e9790 (Aug. 25, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7453921/#:~:text=Results,through%20contact%20with%20contaminated%20textiles (last visited May 18, 2021).

108. Given the ubiquity, pervasiveness and increasing transmission of the Coronavirus, including new and emerging variants, no amount of cleaning or ventilation intervention will prevent a person infected and contagious with the Coronavirus from entering an indoor space and exhaling millions of additional Coronavirus droplets and infectious aerosols into the air, further: (a) filling the air with the aerosolized Coronavirus that can be inhaled, sometimes with deadly consequences; and (b) depositing infectious Coronavirus droplets on the surfaces, physically altering and transforming those surfaces into disease-transmitting fomites.

### *Burlington's Stores and Other Locations Reopened Under Severe Restrictions Designed to Protect Customers, Associates, and Property*

109. Beginning on May 11, 2020, Burlington started re-opening its stores following the March 2020 closures.

110. The reopening of Burlington's stores and distribution centers did not abate Burlington's losses arising from the loss of or damage to its property. To the contrary, in order to prevent further direct physical loss of or damage to its property and to stay open and continue operating its stores and distribution centers in a safe and compliant manner, Burlington has incurred significant costs and extra expenses and imposed restrictions on certain of its services. These costs/expenses/bans/restrictions include, but are not limited to:

- operating the Burlington stores at reduced hours of operation;

- providing Personal Protective Equipment (PPE) to its associates such as facemasks, face shields, and gloves;

- designing, engineering, and installing barriers (such as point of sale locations) to hamper direct and droplet transmission of the Coronavirus and COVID-19 and foster social distancing;

- closing and barricading of all fitting rooms;

- making hand sanitizer, disinfecting wipes, soap, and water readily available to customers and associates;

- purchasing and placing readily visible signage to encourage safe practices among associates and customers;

- regularly and frequently cleaning any high-touch and frequently touched surfaces according to heightened CDC and state department of health guidelines;

- dramatically increasing cleaning frequency at its stores;

- removing fixtures to widen aisles to allow for additional social distancing; and

- upgrading HVAC ventilation filters at certain stores.

## C.    Burlington Sustained Devastating Losses

111.    Burlington has suffered and continues to suffer catastrophic losses from the loss of and damage to its Covered Property and other Property of the type insured, and the necessary suspension of its business activities.

112.    In particular, since the onset of the Coronavirus and COVID-19, Burlington's revenues have declined, disrupting its business as well as the jobs and livelihoods of the over 50,000 associates who were employed by Burlington when the pandemic began. The human toll this has caused is inestimable.

113.    The financial toll on Burlington, however, is measurable and significant.

114.    Burlington's insurable business interruption and other losses, arising in connection with Coronavirus and COVID-19, are currently calculated to be in excess of $750 million.

## D.    Zurich Failed to Investigate or Cover Burlington's Claim for Insurance

115.    On December 28, 2020, Burlington presented a First Notice of Loss to Zurich in connection with Burlington's losses arising from the Coronavirus and COVID-19.

116.    Zurich acknowledged that First Notice of Loss the following day, assigning it Claim Number: 5630061488.

117.    On March 31, 2021, Burlington submitted its estimated claim for insurance to Zurich.

118.    Zurich has failed to respond to Burlington's claim for insurance.

119.    Zurich has not sent an adjuster – or anyone on its behalf – to visit, inspect or set foot in any Burlington stores or distribution centers or to otherwise investigate Burlington's claim for insurance.

120.    Upon information and belief, Zurich has not conducted any investigation into Burlington's claim for insurance.

## FIRST COUNT
### DECLARATORY JUDGMENT

121.    Burlington repeats and realleges each and every allegation set forth above as though fully set forth herein.

122.    Burlington seeks a declaration that Zurich is obligated, in accordance with the terms of the Zurich All Risks Policies, to provide insurance coverage for the losses sustained by Burlington as set forth herein.

123.    An actual and justifiable controversy exists between the parties with respect to this issue because of Zurich's refusal to perform its obligations under the Zurich All Risks Policies.

124.    A declaration of the parties' rights and obligations under the Zurich All Risks Policies will serve to resolve the dispute between them.

**WHEREFORE**, Burlington demands judgment in its favor and against Zurich as follows:

(a)     declaring and adjudging the rights and obligations of the parties under the Zurich All Risks Policies;

(b)     granting Burlington money damages, including money damages available as supplemental and further relief under N.J.S.A. 2A:16-60, in an amount to be determined at trial, together with pre- and postjudgment interest;

(c)     requiring Zurich to pay Burlington's reasonable attorneys' fees in this action;

(d)     requiring Zurich to repay Burlington for the costs of suit incurred herein; and

(e)     providing for such other and further relief, including any appropriate equitable relief, as the Court may deem just and proper.

### JURY DEMAND

Burlington hereby demands trial by jury on all issues so triable.

Respectfully submitted,

**FLASTER/GREENBERG PC**

Dated: May 18, 2021      By:    */s/ John G. Koch*
           Lee M. Epstein, Esquire
           John G. Koch, Esquire
           Matthew A. Goldstein, Esquire
           1810 Chapel Avenue West
           Cherry Hill, New Jersey 08002
           Tel: (856) 661-1900
           Fax: (856) 661-1919
           lee.epstein@flastergreenberg.com
           john.koch@flastergreenberg.com
           matthew.goldstein@flastergreenberg.com
           *Attorneys for Plaintiff Burlington Stores,*
           *Inc.*

## RULE 4:5-1 CERTIFICATION

I certify, pursuant to Rule 4:5-1, that to the best of my knowledge, information and belief the matter in controversy is not the subject matter of any other action pending in any other court, nor of any pending arbitration proceeding, and no other action or arbitration is contemplated; further there are no other parties who should be joined in this action.

FLASTER/GREENBERG PC

By:   /s/ John G. Koch
      John G. Koch

## RULE 1:38-7 CERTIFICATION

I certify that confidential personal identifiers have been redacted from documents now submitted to the Court, and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

FLASTER/GREENBERG PC

By:   /s/ John G. Koch
      John G. Koch

```
BURLINGTON COUNTY
SUPERIOR COURT
49 RANCOCAS ROAD
MT HOLLY          NJ 08060
                                        TRACK ASSIGNMENT NOTICE
COURT TELEPHONE NO. (609) 288-9500
COURT HOURS  8:30 AM - 4:30 PM


                        DATE:   MAY 19, 2021
                        RE:     BURLINGTON STORES INC VS ZURICH AMERICAN INSURANCE
                        DOCKET: BUR L -001053 21


     THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 1.

     DISCOVERY IS   150 DAYS AND RUNS FROM THE FIRST ANSWER OR 90 DAYS
FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.

     THE PRETRIAL JUDGE ASSIGNED IS:  HON JAMES J. FERRELLI

     IF YOU HAVE ANY QUESTIONS, CONTACT TEAM      003
AT:  (609) 288-9500.

     IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
     PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.
                        ATTENTION:
                                    ATT: JOHN G. KOCH
                                    FLASTER GREENBERG PC
                                    1835 MARKET ST
                                    STE 1050
                                    PHILADELPHIA      PA 19103


JUCCAU0
```

P4685863

BURLINGTON STORES, INC.
PLAINTIFF
- vs -
ZURICH AMERICAN INSURANCE COMPANY
DEFENDANT

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION BURLINGTON COUNTY
Docket No. BUR-L-001053-21

**Person to be Served**
ZURICH AMERICAN INSURANCE COMPANY
C/O NEW JERSEY DEPARTMENT OF BANKING AND INSURANCE
20 WEST STATE STREET

TRENTON, NJ 08625

**AFFIDAVIT OF SERVICE**
(For Use By Private Service)

**Papers Served:** SUMMONS, CASE INFORMATION STATEMENT, COMPLAINT, JURY DEMAND, RULE 4:5-1 CERTIFICATION, RULE 1:38-7 CERTIFICATION, TRACK ASSIGNMENT NOTICE, CHECK, SELF ADDRESSED RETURN ENVELOPE AND EXHIBITS
**Service Data:**
Served Successfully **X** Not Served _____ Date: _05/26/2021_ Time:_ 10:48 AM Attempts: _____

___ Delivered a copy to him/her personally

___ Left a copy with a competent household member of over 14 years of age residing therein.

**X** Left a copy with a person authorized to accept service, e.g. managing agent, registered agent, etc.

Name of person served and relationship / title:

DEBRA MULLEN

ADMINISTRATIVE ASSISTANT / AUTHORIZED TO ACCEPT

**Description of Person Accepting Service:**

SEX: **FEMALE**    COLOR: **WHITE**    HAIR: **BROWN**    APP.AGE: **43**    APP. HT: **5'7"**    APP. WT: **140**
OTHER:

**Comments Or Remarks:**

*Edward J. McDonell*

Sworn to before me this
26 day of MAY, 2021

I, CHARLES MONTELEONE, was at the time of service a competent adult not having a direct interest in the litigation. I declare under penalty of perjury that the foregoing is true and correct.

_____
Signature of Process Server          Date

EDWARD J. McDONALD
NOTARY PUBLIC OF NEW JERSEY
COMMISSION # 50004842
MY COMMISSION EXPIRES 10/21/2024

Client File Number:

PM Legal
219 South Street STE 102
New Providence, NJ 07974
908-897-0273
FLASTER GREENBERG

**FLASTER/GREENBERG PC**
By: Lee M. Epstein (*pro hac vice application forthcoming*)
   John G. Koch (Attorney No.: 042572005)
   Matthew A. Goldstein (Attorney No.: 029212010)
1810 Chapel Avenue West
Cherry Hill, New Jersey 08002
Tel: (856) 661-1900
Fax: (856) 661-1919
Email: lee.epstein@flastergreenberg.com
   john.koch@flastergreenberg.com
   matthew.goldstein@flastergreenberg.com
*Attorneys for Plaintiff Burlington Stores, Inc.*

| | |
|---|---|
| BURLINGTON STORES, INC., | SUPERIOR COURT OF NEW JERSEY LAW DIVISION BURLINGTON COUNTY |
| Plaintiff, | |
| v. | DOCKET NO.: BUR-L-001053-21 |
| ZURICH AMERICAN INSURANCE COMPANY, | **NOTICE OF MOTION FOR *PRO HAC VICE* ADMISSION OF LEE M. EPSTEIN, ESQ.** |
| Defendant. | |

TO: **HONORABLE JAMES J. FERRELLI, J.S.C.**
   **Superior Court of New Jersey**
   **Burlington County Courts Facility**
   **49 Rancocas Road, 4th Floor**
   **Mount Holly, NJ 08060**

   **ZURICH AMERICAN INSURANCE COMPANY**
   **500 Enterprise Drive, Suite 2A**
   **Rocky Hill, CT 06067-3913**

**PLEASE TAKE NOTICE** that on June 11, 2021, at 9:00 a.m., or as soon thereafter as

counsel may be heard, Plaintiff Burlington Stores, Inc. ("Plaintiff"), by and through its attorneys

Flaster/Greenberg PC, shall move before the Honorable James J. Ferrelli, in the Superior Court of

New Jersey, Law Division, Burlington County, at the Burlington County Courts Facility, 49

Rancocas Road, 4th Floor, Mount Holly, NJ 08060 or by such other means as directed by the

8302728 v1

Court, pursuant to R. 1:21-2 of the New Jersey Court Rules, for an Order admitting Lee M. Epstein, Esq. of Flaster/Greenberg PC *pro hac vice* in this matter.

      **PLEASE TAKE FURTHER NOTICE** that in support of this Motion, Plaintiff shall rely upon this Notice of Motion; Certifications of John G. Koch, Esq. and Lee M. Epstein, Esq.; and the proposed form of Order submitted herewith.

      **PLEASE TAKE FURTHER NOTICE** that, pursuant to R. 1:6-2(d), oral argument is hereby requested if this Motion is opposed.

                    Respectfully submitted,

                    **FLASTER/GREENBERG PC**

Dated: May 26, 2021         By:    */s/ John G. Koch*
                        John G. Koch, Esquire
                        *Attorneys for Plaintiff Burlington Stores, Inc.*

8302728 v1

**FLASTER/GREENBERG PC**
By:    Lee M. Epstein (*pro hac vice application forthcoming*)
       John G. Koch (Attorney No.: 042572005)
       Matthew A. Goldstein (Attorney No.: 029212010)
1810 Chapel Avenue West
Cherry Hill, New Jersey 08002
Tel: (856) 661-1900
Fax: (856) 661-1919
Email: lee.epstein@flastergreenberg.com
       john.koch@flastergreenberg.com
       matthew.goldstein@flastergreenberg.com
*Attorneys for Plaintiff Burlington Stores, Inc.*

| | |
|---|---|
| BURLINGTON STORES, INC., <br><br> Plaintiff, <br><br> v. <br><br> ZURICH AMERICAN INSURANCE COMPANY, <br><br> Defendant. | SUPERIOR COURT OF NEW JERSEY <br> LAW DIVISION <br> BURLINGTON COUNTY <br><br> DOCKET NO.: BUR-L-001053-21 <br><br> **CERTIFICATION OF JOHN G. KOCH, ESQ. IN SUPPORT OF MOTION FOR *PRO HAC VICE* ADMISSION OF LEE M. EPSTEIN, ESQ.** |

JOHN G. KOCH, certifies and states as follows:

1.     I am an attorney-at-law of the State of New Jersey and a member of the bar of this Court, as well as a Shareholder of the law firm of Flaster/Greenberg PC, counsel for Plaintiff Burlington Stores, Inc. ("Plaintiff") in this matter. I make this Certification in support of Plaintiff's request, pursuant to R. 1:21-2, to admit Lee M. Epstein, Esq. of the law firm of Flaster/Greenberg PC, 1810 Chapel Avenue West, Cherry Hill, New Jersey 08002 ("Applicant"), *pro hac vice* in this matter.

2.     Plaintiff has requested that the Applicant represent it in this matter.

3.     The Applicant is a member in good standing of the Bar of the State of New York and the Commonwealth of Pennsylvania. He is not under suspension and has not been disbarred from any court.

8302728 v1

4.      For the reasons set forth in this Certification and the Applicant's Certification, good cause exists for the Applicant's *pro hac vice* admission under R. 1:21-2(b)(3)(A) and (B). This includes that the Applicant has experience and expertise litigating the factual and legal issues present in this lawsuit, and the Applicant's law firm has had an extended attorney-client relationship with Plaintiff.

5.      Upon the Applicant's admission *pro hac vice*, I will continue to participate and serve as counsel for Plaintiff in this matter. In addition, I will ensure that the Applicant annually complies with the requirements of R. 1:20-1(b), R. 1:28-2 and R. 1:28B-1(e) during the period of his admission.

6.      The Applicant's admission *pro hac vice* will not delay these proceedings or prejudice the other party in any manner.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Respectfully submitted,

**FLASTER/GREENBERG PC**

Dated: May 26, 2021                    By:     */s/ John G. Koch*_____
                                                John G. Koch, Esquire
                                                *Attorneys for Plaintiff Burlington Stores,*
                                                *Inc.*

8302728 v1

**FLASTER/GREENBERG PC**
By:    Lee M. Epstein (*pro hac vice application forthcoming*)
        John G. Koch (Attorney No.: 042572005)
        Matthew A. Goldstein (Attorney No.: 029212010)
1810 Chapel Avenue West
Cherry Hill, New Jersey 08002
Tel: (856) 661-1900
Fax: (856) 661-1919
Email: lee.epstein@flastergreenberg.com
       john.koch@flastergreenberg.com
       matthew.goldstein@flastergreenberg.com
*Attorneys for Plaintiff Burlington Stores, Inc.*

| | |
|---|---|
| BURLINGTON STORES, INC., <br><br>         Plaintiff, <br><br>       v. <br><br> ZURICH AMERICAN INSURANCE COMPANY, <br><br>         Defendant. | SUPERIOR COURT OF NEW JERSEY <br> LAW DIVISION <br> BURLINGTON COUNTY <br><br> DOCKET NO.: BUR-L-001053-21 <br><br> **ORDER GRANTING MOTION FOR *PRO HAC VICE* ADMISSION OF LEE M. EPSTEIN, ESQ.** |

THIS MATTER having been opened to the Court on Motion by Plaintiff Burlington Stores, Inc. ("Plaintiff"), by and through its counsel, on notice to all parties to this action, for the entry of an Order admitting Lee M. Epstein, Esq. of Flaster/Greenberg PC (the "Applicant") *pro hac vice* in this matter, pursuant to R. 1:21-2; and the Court having considered the written submissions filed in connection with this Motion; and the Court having heard the arguments of counsel, if any; and good cause having been shown for the within Order;

IT IS on this _____ day of _____, 2021, ORDERED as follows:

1.     The Motion is GRANTED in its entirety.

2.     The Applicant is permitted to appear and participate *pro hac vice* on behalf of Plaintiff in this matter.

8302728 v1

3.    Applicant shall pay the annual fees to the New Jersey Lawyers Fund for Client Protection and the New Jersey Lawyers Assistance Programs in accordance with R. 1:28-2 and R. 1:28B-1.

4.    While appearing and participating in this matter, the Applicants shall:

(a)    Comply with the New Jersey Court Rules, including all disciplinary rules;

(b)    Consent to the appointment of the Clerk of the New Jersey Supreme Court as agent to accept service of process for all actions against the Applicant or the Applicant's law firm that may arise out of the Applicant's participation in the case;

(c)    Consent to the appointment of the Clerk of the New Jersey Supreme Court as agent to accept service of process for all actions against the Applicant or the Applicant's law firm that may arise out of the Applicant's participation in the case;

(d)    Notify the Court immediately of any matter affecting the Applicant's standing at the bar of any other court;

(e)    Have all pleadings, briefs, and other papers filed with the Court signed by an attorney of record authorized to practice in this State, who shall be held responsible for them and for the conduct of the cause and of the admitted attorney therein; and

(f)    Agree to any other requirements on participation as the Court deems necessary.

5.    Plaintiff shall serve a copy of this Order upon all counsel of record within seven (7) days of receipt by Plaintiff's counsel in accordance with the New Jersey Rules of Court.

_____
HONORABLE JAMES J. FERRELLI, J.S.C.

_____ UNOPPOSED
_____ OPPOSED

8302728 v1

**FLASTER/GREENBERG PC**
By:    Lee M. Epstein (*pro hac vice application forthcoming*)
        John G. Koch (Attorney No.: 042572005)
        Matthew A. Goldstein (Attorney No.: 029212010)
1810 Chapel Avenue West
Cherry Hill, New Jersey 08002
Tel: (856) 661-1900
Fax: (856) 661-1919
Email: lee.epstein@flastergreenberg.com
       john.koch@flastergreenberg.com
       matthew.goldstein@flastergreenberg.com
*Attorneys for Plaintiff Burlington Stores, Inc.*

| | |
|---|---|
| BURLINGTON STORES, INC., <br><br> Plaintiff, <br><br> v. <br><br> ZURICH AMERICAN INSURANCE COMPANY, <br><br> Defendant. | SUPERIOR COURT OF NEW JERSEY <br> LAW DIVISION <br> BURLINGTON COUNTY <br><br> DOCKET NO.: BUR-L-001053-21 <br><br> **CERTIFICATE OF SERVICE** |

      John G. Koch, Esq., being of full age, hereby certifies and states as follows:

      1.     I am a Shareholder of the law firm of Flaster/Greenberg PC, attorneys for Plaintiff

Burlington Stores, Inc. in this matter.

      2.     On May 26, 2021, I caused to be served a true and correct copy of the Motion for

*Pro Hac Vice* Admission via eCourts, ordinary mail, and certified mail, return receipt requested,

upon the following:

Zurich American Insurance Company
500 Enterprise Drive, Suite 2A
Rocky Hill, CT 06067-3913

8302728 v1

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

**FLASTER/GREENBERG PC**

Dated: May 26, 2021                    By:    */s/ John G. Koch*
                                              John G. Koch, Esquire
                                              *Attorneys for Plaintiff Burlington Stores,*
                                              *Inc.*

**FLASTER/GREENBERG PC**
By:   Lee M. Epstein (*pro hac vice application forthcoming*)
       John G. Koch (Attorney No.: 042572005)
       Matthew A. Goldstein (Attorney No.: 029212010)
1810 Chapel Avenue West
Cherry Hill, New Jersey 08002
Tel: (856) 661-1900
Fax: (856) 661-1919
Email: lee.epstein@flastergreenberg.com
         john.koch@flastergreenberg.com
         matthew.goldstein@flastergreenberg.com
*Attorneys for Plaintiff Burlington Stores, Inc.*

| | |
|---|---|
| BURLINGTON STORES, INC., <br><br> Plaintiff, <br><br> v. <br><br> ZURICH AMERICAN INSURANCE COMPANY, <br><br> Defendant. | SUPERIOR COURT OF NEW JERSEY <br> LAW DIVISION <br> BURLINGTON COUNTY <br><br> DOCKET NO.: BUR-L-001053-21 <br><br> **CERTIFICATION OF LEE M. EPSTEIN, ESQ. IN SUPPORT OF MOTION FOR *PRO HAC VICE* ADMISSION** |

LEE M. EPSTEIN, certifies and states as follows:

1.      I make this Certification in support of my application for admission to the Bar of this Court for purposes of representing Plaintiff Burlington Stores, Inc. ("Plaintiff") in this matter. I am a Shareholder with the law firm of Flaster/Greenberg PC, 1810 Chapel Avenue West, Cherry Hill, New Jersey 08002, counsel for Plaintiff in this matter. I make this Certification in support of Plaintiff's Motion to admit me *pro hac vice* in this matter.

2.      I am a duly licensed attorney and a member in good standing of the Bar of the Commonwealth of Pennsylvania (admitted to practice in 1991) where I currently principally practice law, and the State of New York (admitted to practice in 1987). I am also admitted to practice law and am a member in good standing in the following federal courts: U.S. District Court for the Eastern District of Pennsylvania (admitted to practice in 1991); U.S. District Court for the

Middle District of Pennsylvania (admitted to practice in 2011); U.S. District Court for the Western District of Pennsylvania (admitted to practice in 1997); U.S. District Court for the Eastern District of New York (admitted to practice in 1989); U.S. District Court for the Southern District of New York (admitted to practice in 1989); U.S. District Court for the District of Colorado (admitted to practice in 2009); U.S. District Court for the Central District of Illinois (admitted to practice in 2012); U.S. Court of Appeals for the Second Circuit (admitted to practice in 2019); U.S. Court of Appeals for the Third Circuit (admitted to practice in 2010); U.S. Court of Appeals for the Ninth Circuit (admitted to practice in 2009); U.S. Court of Appeals for the Tenth Circuit (admitted to practice in 2010); and the Supreme Court of the United States of America (admitted to practice in 2011).

3.      If admitted *pro hac vice*, I will be associated in this matter with licensed New Jersey counsel of record, John G. Koch, Esq. and Matthew A. Goldstein, Esq., attorneys with the firm of Flaster/Greenberg PC, who are qualified to practice under R. 1:21-1.

4.      Plaintiff has requested that I represent it in this matter.

5.      Good cause exists for my *pro hac vice* admission because I have specialized skills and knowledge with respect to matters important to Plaintiff in this litigation, and my firm has had an attorney-client relationship with Plaintiff for an extended period of time.

6.      No disciplinary proceedings are pending against, and no discipline has been imposed on me in any jurisdiction.

7.      If granted pro hac vice admission, I will comply with the annual payment obligations set out in R. 1:20-1(b), R. 1:28-2, and R. 1:28B-1(e).

8.      If granted *pro hac vice* admission, I agree to:

8302728 v1

(a)      Abide by the Rules Governing the Courts of the State of New Jersey, including all disciplinary rules, R̲. 1:20-1, and R̲. 1:28-2;

(b)      Consent to the appointment of the Clerk of the Supreme Court of the State of New Jersey as agent upon whom service of process may be made for all actions against me or my firm that may arise out of my participation in this matter;

(c)      Notify the Court immediately of any matter affecting my standing at the Bar of any other Court; and

(d)      Have all pleadings, briefs, and other papers filed with the Court signed by John G. Koch, Esq. or Matthew A. Goldstein, Esq. of Flaster/Greenberg PC, who are authorized to practice law in this State, and who shall be held responsible for these filings and conduct of this case.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**FLASTER/GREENBERG PC**

Dated: May 26, 2021                    By:      _/s/ Lee M. Epstein_____
                                                Lee M. Epstein, Esquire
                                                _Attorneys for Plaintiff Burlington Stores,_
                                                _Inc._

**FLASTER/GREENBERG PC**
By:    Lee M. Epstein (*pro hac vice application forthcoming*)
        John G. Koch (Attorney No.: 042572005)
        Matthew A. Goldstein (Attorney No.: 029212010)
1810 Chapel Avenue West
Cherry Hill, New Jersey 08002
Tel: (856) 661-1900
Fax: (856) 661-1919
Email: lee.epstein@flastergreenberg.com
       john.koch@flastergreenberg.com
       matthew.goldstein@flastergreenberg.com
*Attorneys for Plaintiff Burlington Stores, Inc.*

| | |
|---|---|
| BURLINGTON STORES, INC., <br><br>         Plaintiff, <br><br>         v. <br><br> ZURICH AMERICAN INSURANCE COMPANY, <br><br>         Defendant. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION BURLINGTON COUNTY <br><br> DOCKET NO.: BUR-L-001053-21 <br><br> **ORDER GRANTING MOTION FOR *PRO HAC VICE* ADMISSION OF LEE M. EPSTEIN, ESQ.** |

THIS MATTER having been opened to the Court on Motion by Plaintiff Burlington Stores, Inc. ("Plaintiff"), by and through its counsel, on notice to all parties to this action, for the entry of an Order admitting Lee M. Epstein, Esq. of Flaster/Greenberg PC (the "Applicant") *pro hac vice* in this matter, pursuant to R. 1:21-2; and the Court having considered the written submissions filed in connection with this Motion; and the Court having heard the arguments of counsel, if any; and good cause having been shown for the within Order;

IT IS on this \_\_\_\_\_ day of _____, 2021, ORDERED as follows:

1.      The Motion is GRANTED in its entirety.

2.      The Applicant is permitted to appear and participate *pro hac vice* on behalf of Plaintiff in this matter.

8302728 v1

3.  Applicant shall pay the annual fees to the New Jersey Lawyers Fund for Client Protection and the New Jersey Lawyers Assistance Programs in accordance with R. 1:28-2 and R. 1:28B-1.

4.  While appearing and participating in this matter, the Applicants shall:

(a)  Comply with the New Jersey Court Rules, including all disciplinary rules;

(b)  Consent to the appointment of the Clerk of the New Jersey Supreme Court as agent to accept service of process for all actions against the Applicant or the Applicant's law firm that may arise out of the Applicant's participation in the case;

(c)  Consent to the appointment of the Clerk of the New Jersey Supreme Court as agent to accept service of process for all actions against the Applicant or the Applicant's law firm that may arise out of the Applicant's participation in the case;

(d)  Notify the Court immediately of any matter affecting the Applicant's standing at the bar of any other court;

(e)  Have all pleadings, briefs, and other papers filed with the Court signed by an attorney of record authorized to practice in this State, who shall be held responsible for them and for the conduct of the cause and of the admitted attorney therein; and

(f)  Agree to any other requirements on participation as the Court deems necessary.

5.  Plaintiff shall serve a copy of this Order upon all counsel of record within seven (7) days of receipt by Plaintiff's counsel in accordance with the New Jersey Rules of Court.

_____
HONORABLE JAMES J. FERRELLI, J.S.C.

_____ UNOPPOSED
_____ OPPOSED

8302728 v1

**FLASTER/GREENBERG PC**
By:   Lee M. Epstein (*pro hac vice application forthcoming*)
      John G. Koch (Attorney No.: 042572005)
      Matthew A. Goldstein (Attorney No.: 029212010)
1810 Chapel Avenue West
Cherry Hill, New Jersey 08002
Tel: (856) 661-1900
Fax: (856) 661-1919
Email: lee.epstein@flastergreenberg.com
      john.koch@flastergreenberg.com
      matthew.goldstein@flastergreenberg.com
*Attorneys for Plaintiff Burlington Stores, Inc.*

| | |
|---|---|
| BURLINGTON STORES, INC., <br><br> Plaintiff, <br><br> v. <br><br> ZURICH AMERICAN INSURANCE COMPANY, <br><br> Defendant. | SUPERIOR COURT OF NEW JERSEY <br> LAW DIVISION <br> BURLINGTON COUNTY <br><br> DOCKET NO.: BUR-L-001053-21 <br><br> **CERTIFICATION OF JOHN G. KOCH, ESQ. IN SUPPORT OF MOTION FOR *PRO HAC VICE* ADMISSION OF LEE M. EPSTEIN, ESQ.** |

JOHN G. KOCH, certifies and states as follows:

1.      I am an attorney-at-law of the State of New Jersey and a member of the bar of this Court, as well as a Shareholder of the law firm of Flaster/Greenberg PC, counsel for Plaintiff Burlington Stores, Inc. ("Plaintiff") in this matter. I make this Certification in support of Plaintiff's request, pursuant to <u>R.</u> 1:21-2, to admit Lee M. Epstein, Esq. of the law firm of Flaster/Greenberg PC, 1810 Chapel Avenue West, Cherry Hill, New Jersey 08002 ("Applicant"), *pro hac vice* in this matter.

2.      Plaintiff has requested that the Applicant represent it in this matter.

3.      The Applicant is a member in good standing of the Bar of the State of New York and the Commonwealth of Pennsylvania. He is not under suspension and has not been disbarred from any court.

8302728 v1

4.     For the reasons set forth in this Certification and the Applicant's Certification, good cause exists for the Applicant's *pro hac vice* admission under R. 1:21-2(b)(3)(A) and (B). This includes that the Applicant has experience and expertise litigating the factual and legal issues present in this lawsuit, and the Applicant's law firm has had an extended attorney-client relationship with Plaintiff.

5.     Upon the Applicant's admission *pro hac vice*, I will continue to participate and serve as counsel for Plaintiff in this matter. In addition, I will ensure that the Applicant annually complies with the requirements of R. 1:20-1(b), R. 1:28-2 and R. 1:28B-1(e) during the period of his admission.

6.     The Applicant's admission *pro hac vice* will not delay these proceedings or prejudice the other party in any manner.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Respectfully submitted,

**FLASTER/GREENBERG PC**

Dated: May 26, 2021                    By:     */s/ John G. Koch*
                                               John G. Koch, Esquire
                                               *Attorneys for Plaintiff Burlington Stores, Inc.*

**FLASTER/GREENBERG PC**
By:   Lee M. Epstein (*pro hac vice application forthcoming*)
      John G. Koch (Attorney No.: 042572005)
      Matthew A. Goldstein (Attorney No.: 029212010)
1810 Chapel Avenue West
Cherry Hill, New Jersey 08002
Tel: (856) 661-1900
Fax: (856) 661-1919
Email: lee.epstein@flastergreenberg.com
      john.koch@flastergreenberg.com
      matthew.goldstein@flastergreenberg.com
*Attorneys for Plaintiff Burlington Stores, Inc.*

| | |
|---|---|
| BURLINGTON STORES, INC., <br><br> Plaintiff, <br><br> v. <br><br> ZURICH AMERICAN INSURANCE COMPANY, <br><br> Defendant. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION BURLINGTON COUNTY <br><br> DOCKET NO.: BUR-L-001053-21 <br><br> **CERTIFICATION OF LEE M. EPSTEIN, ESQ. IN SUPPORT OF MOTION FOR *PRO HAC VICE* ADMISSION** |

LEE M. EPSTEIN, certifies and states as follows:

1.     I make this Certification in support of my application for admission to the Bar of this Court for purposes of representing Plaintiff Burlington Stores, Inc. ("Plaintiff") in this matter. I am a Shareholder with the law firm of Flaster/Greenberg PC, 1810 Chapel Avenue West, Cherry Hill, New Jersey 08002, counsel for Plaintiff in this matter. I make this Certification in support of Plaintiff's Motion to admit me *pro hac vice* in this matter.

2.     I am a duly licensed attorney and a member in good standing of the Bar of the Commonwealth of Pennsylvania (admitted to practice in 1991) where I currently principally practice law, and the State of New York (admitted to practice in 1987). I am also admitted to practice law and am a member in good standing in the following federal courts: U.S. District Court for the Eastern District of Pennsylvania (admitted to practice in 1991); U.S. District Court for the

8302728 v1

Middle District of Pennsylvania (admitted to practice in 2011); U.S. District Court for the Western District of Pennsylvania (admitted to practice in 1997); U.S. District Court for the Eastern District of New York (admitted to practice in 1989); U.S. District Court for the Southern District of New York (admitted to practice in 1989); U.S. District Court for the District of Colorado (admitted to practice in 2009); U.S. District Court for the Central District of Illinois (admitted to practice in 2012); U.S. Court of Appeals for the Second Circuit (admitted to practice in 2019); U.S. Court of Appeals for the Third Circuit (admitted to practice in 2010); U.S. Court of Appeals for the Ninth Circuit (admitted to practice in 2009); U.S. Court of Appeals for the Tenth Circuit (admitted to practice in 2010); and the Supreme Court of the United States of America (admitted to practice in 2011).

3.      If admitted *pro hac vice*, I will be associated in this matter with licensed New Jersey counsel of record, John G. Koch, Esq. and Matthew A. Goldstein, Esq., attorneys with the firm of Flaster/Greenberg PC, who are qualified to practice under R. 1:21-1.

4.      Plaintiff has requested that I represent it in this matter.

5.      Good cause exists for my *pro hac vice* admission because I have specialized skills and knowledge with respect to matters important to Plaintiff in this litigation, and my firm has had an attorney-client relationship with Plaintiff for an extended period of time.

6.      No disciplinary proceedings are pending against, and no discipline has been imposed on me in any jurisdiction.

7.      If granted pro hac vice admission, I will comply with the annual payment obligations set out in R. 1:20-1(b), R. 1:28-2, and R. 1:28B-1(e).

8.      If granted *pro hac vice* admission, I agree to:

8302728 v1

(a)     Abide by the Rules Governing the Courts of the State of New Jersey, including all disciplinary rules, R. 1:20-1, and R. 1:28-2;

(b)     Consent to the appointment of the Clerk of the Supreme Court of the State of New Jersey as agent upon whom service of process may be made for all actions against me or my firm that may arise out of my participation in this matter;

(c)     Notify the Court immediately of any matter affecting my standing at the Bar of any other Court; and

(d)     Have all pleadings, briefs, and other papers filed with the Court signed by John G. Koch, Esq. or Matthew A. Goldstein, Esq. of Flaster/Greenberg PC, who are authorized to practice law in this State, and who shall be held responsible for these filings and conduct of this case.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**FLASTER/GREENBERG PC**

Dated: May 26, 2021          By:     */s/ Lee M. Epstein*_____
                                     Lee M. Epstein, Esquire
                                     *Attorneys for Plaintiff Burlington Stores,*
                                     *Inc.*

**FLASTER/GREENBERG PC**
By:   Lee M. Epstein (*pro hac vice application forthcoming*)
      John G. Koch (Attorney No.: 042572005)
      Matthew A. Goldstein (Attorney No.: 029212010)
1810 Chapel Avenue West
Cherry Hill, New Jersey 08002
Tel: (856) 661-1900
Fax: (856) 661-1919
Email: lee.epstein@flastergreenberg.com
      john.koch@flastergreenberg.com
      matthew.goldstein@flastergreenberg.com
*Attorneys for Plaintiff Burlington Stores, Inc.*

| | |
|---|---|
| BURLINGTON STORES, INC.,<br><br>        Plaintiff,<br><br>        v.<br><br>ZURICH AMERICAN INSURANCE<br>COMPANY,<br><br>        Defendant. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br>BURLINGTON COUNTY<br><br>DOCKET NO.: BUR-L-001053-21<br><br>**CERTIFICATE OF SERVICE** |

John G. Koch, Esq., being of full age, hereby certifies and states as follows:

1.     I am a Shareholder of the law firm of Flaster/Greenberg PC, attorneys for Plaintiff Burlington Stores, Inc. in this matter.

2.     On May 26, 2021, I caused to be served a true and correct copy of the Motion for *Pro Hac Vice* Admission via eCourts, ordinary mail, and certified mail, return receipt requested, upon the following:

Zurich American Insurance Company
500 Enterprise Drive, Suite 2A
Rocky Hill, CT 06067-3913

8302728 v1

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

**FLASTER/GREENBERG PC**

Dated: May 26, 2021        By:    _/s/ John G. Koch_____
                                      John G. Koch, Esquire
                                        _Attorneys for Plaintiff Burlington Stores,_
                                        _Inc._

8302728 v1

**CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Civil Procedure 5 and the Local Civil Rule 5.1, this is to

certify that on this 25th day of June 2021, a copy of the foregoing has been mailed, by overnight

delivery service, to the following:

Lee M. Epstein
John G. Koch (Attorney No.: 042572005)
Matthew A. Goldstein (Attorney No.: 029212010)
**FLASTER/GREENBERG PC**
1810 Chapel Avenue West
Cherry Hill, New Jersey 08002
Tel: (856) 661-1900
Fax: (856) 661-1919
Email: lee.epstein@flastergreenberg.com
john.koch@flastergreenberg.com
matthew.goldstein@flastergreenberg.com

*Attorneys for Plaintiff Burlington Stores, Inc.*

                                         */s/ Susan M. Kennedy*
                                         Susan M. Kennedy